# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 19, 2013         Decided July 8, 2014

No. 12-1060

NEW ENGLAND POWER GENERATORS ASSOCIATION, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PSEG ENERGY RESOURCES & TRADE LLC, ET AL.,
INTERVENORS

———

Consolidated with 12-1074, 12-1085, 12-1149

———

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

———

*Stephen L. Teichler* argued the cause for petitioners NSTAR Electric Company/Public Systems. With him on the briefs was *Mary E. Grover*.

*Jeffrey A. Schwarz* argued the cause for petitioners Massachusetts Municipal Wholesale Electric Company, et al. With him on the briefs were *Scott H. Strauss* and *Peter J. Hopkins.*

*Jeffrey A. Lamken* argued the cause for petitioners New England Power Generators Association, Inc., et al. With him on the briefs were *Martin V. Totara*, *Ashley C. Parrish*, *David G. Tewksbury*, *Stephanie S. Lim*, *Matthew S. Owen*, and *Abraham Silverman*.

*John Lee Shepherd Jr.* argued the cause for intervenors PSEG Energy Resources & Trade LLC, et al. With him on the brief was *Jodi L. Moskowitz*.

*John S. Wright* and *Michael C. Wertheimer*, Assistant Attorneys General, Office of the Attorney General for the State of Connecticut, were on the brief for intervenor George Jepsen, Attorney General for the State of Connecticut, in support of petitioners.

*F. Anne Ross* was on the brief for intervenor New England Conference of Public Utilities Commissioners, Inc. in support of petitioner.

*Robert M. Kennedy Jr.*, Attorney, and *Beth G. Pacella*, Senior Attorney, Federal Energy Regulatory Commission, argued the causes for respondent. With them on the brief were *David L. Morenoff*, Acting General Counsel, and *Robert H. Solomon*, Solicitor.

*Kimberly Frank* argued the cause for intervenor Connecticut Public Utilities Regulatory Authority. With her on the brief were *Randall L. Speck*, *Gregory S. Warner*,

*Robert A. Weishaar, Jr.*, *F. Anne Ross*, and *Stephen L. Teichler*.

*Ashley C. Parrish* and *David G. Tewksbury* were on the brief for intervenor New England Power Generators Association, Inc. in support of respondent.

Before: BROWN and GRIFFITH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Multiple petitioners seek review of orders of the Federal Energy Regulatory Commission ("FERC" or "the Commission") affecting the administration of the Independent System Operator-New England ("ISO-NE") and specifically directed to curtailment of the exercise of market power in the New England energy market. While competing petitioners raise numerous and often opposite objections to FERC's orders, upon review we conclude that none of the petitioners establishes that FERC has committed reversible error, and we therefore deny the petitions for review.

## I. BACKGROUND

### A. *Statutory and Regulatory Framework*

The Commission is charged under the Federal Power Act ("FPA") with regulating the sale and transmission of electric energy, primarily ensuring that energy is provided at a just and reasonable rate. 16 U.S.C. § 824d(a). The Commission has jurisdiction over such sale and transmission, but states retain the right to regulate the facilities responsible for the

generation of electric energy. *Id.* § 824(b). In exercising its duty to oversee the wholesale electricity market, FERC has undertaken to regulate capacity markets, which dictate the amount of electricity available for production and transmission when needed. *See Conn Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 479 (D.C. Cir. 2009). At the foundation of FERC's current regulatory scheme of the electric market stands Order No. 888.[1] In Order No. 888, FERC undertook to promote wholesale competition through open access and nondiscriminatory transmission services. As part of that undertaking, FERC "encouraged the formation of independent system operators (ISOs) to administer transmission services and new markets for wholesale electricity transactions." *Sithe/Independence Power Partners, LP v. FERC*, 285 F.3d 1, 2 (D.C. Cir. 2002). The regulatory scheme contemplates that the ISOs will "adopt transmission (and ancillary services) pricing policies to promote the efficient use of, and investment in, generation, transmission, and consumption" of wholesale electric power in specific energy capacity systems. *Id.* One such ISO is the Independent System Operator-New England, responsible for the electric energy capacity system in the New England region.

---

[1] *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Servs. By Pub. Utils.; Recovery of Stranded Costs by Pub. Utils. & Transmitting Utils.,* Order No. 888, FERC Stats & Regs. ¶ 31,036 (1996), *order on reh'g*, Order No. 888-A, FERC Stats & Regs ¶ 31,048 (1997), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *affirmed in relevant part, remanded in part on other grounds sub nom. Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

To ensure reliable electrical power, a system operator such as ISO-NE must implement a scheme that will incent resources to provide sufficient energy capacity, or energy available for later use. New England's chosen scheme involves a Forward Capacity Market ("FCM"), which sets capacity price for the following three years via auction. After completing two auctions in 2008 under the most recent capacity market regime, New England market participants submitted on December 1, 2008 a filing to the Commission identifying certain parameters of the capacity market requiring further attention. Subsequently, after Auction 3, New England participants proposed revisions to the capacity market rules in a February 22, 2010 filing. FERC entered four orders regarding these and subsequent requests for modification that are before us.

In its orders, FERC imposed buyer- and supplier-side mitigation measures which, apparently, satisfied exactly none of its constituents. Petitioners NSTAR Electric Company ("NSTAR"), along with Massachusetts Municipal Wholesale Electric Company and New Hampshire Electric Cooperative, Inc. (together, "Public Systems"), challenge FERC's buyer-side mitigation measures as going too far. Public Systems also assert that the Commission lacks jurisdiction under the Federal Power Act to impose these mitigation measures, an argument joined by Intervenors the Attorney General for the State of Connecticut ("Connecticut") and the New England Conference of Public Utilities Commissioners ("New England Commissioners").

Petitioners New England Power Generators Association, Inc. ("NEPGA") and several electricity generators, NRG Power Marketing LLC, Connecticut Jet Power LLC, Devon Power LLC, Middletown Power LLC, Montville Power LLC, Norwalk Power LLC, and Somerset Power LLC (together,

"Suppliers"), challenge the buyer-side mitigation measures as too lenient, while contending that the seller-side measures are too harsh.

For the reasons explained below, we hold that the orders on review fall within FERC's statutory rate-making authority conferred by the FPA. Because FERC undertook its balancing responsibilities in the capacity market with appropriate consideration and based its decision on substantial evidence, we defer to the Commission's sound judgment in crafting mitigation measures responsive to the needs of the New England Forward Capacity Market, and therefore deny each of the petitions before us.

## B. *The* Devon Power *Settlement*

The New England market fashioned the particulars of its capacity market via a settlement including stakeholders of all stripes. FERC initially approved the Forward Capacity Market, *Devon Power LLC*, 115 FERC ¶ 61,340 ("Settlement Order"), *order on reh'g*, 117 FERC ¶ 61,133 (2006) ("Settlement Rehearing Order"), and all aspects of the Commission's determination were eventually affirmed by this Court and/or the Supreme Court. *See Me. Pub. Utils. Comm'n v. FERC*, 520 F.3d 464, 467 (D.C. Cir. 2008), *rev'd in part sub nom. NRG Power Mktg. v. Me. Pub. Utils. Comm'n*, 558 U.S. 165 (2010).

The settlement contemplated use of auctions through which utilities can secure obligations to provide capacity. Before each auction, ISO-NE determines the amount of capacity that will be required for system reliability in three years—the Installed Capacity Requirement. *Conn. Dep't*, 569 F.3d at 480. Each energy provider is required to purchase enough capacity to meet its share of the Installed Capacity

Requirement. *Id.* The auction is a "descending clock auction" in which the price gradually drops until the total amount of capacity offered by suppliers equals the Installed Capacity Requirement. The starting price for the auction is set at twice the estimated "Cost of New Entry." *Id.* Cost of New Entry is the price of capacity, expressed in $/kilowatt-month, that is needed to attract new capacity. Settlement Order ¶ 130. Theoretically, such a pricing scheme allows for the market to signal its need for additional electrical generation, while enabling generators to recover their costs. *See TC Ravenswood, LLC v. FERC*, 741 F.3d 112, 114 (D.C. Cir. 2013).

The settlement provided several features designed to assure that the Forward Capacity Market did not suffer from the exercise of buyer-side market power, wherein the price of capacity drops too low to produce just and reasonable electricity rates. First, an Internal Market Monitor was to review the bids to ensure that they actually reflect a resource's long-run costs. Settlement Order ¶ 109. Any bid below those costs would be deemed out-of-market (also known as "below-cost" or "uneconomic"). *Id.* When such a bid is discovered, the capacity clearing price (*i.e.*, the closing price of the auction) would be reset under the Alternative Price Rule to either (1) Cost of New Entry or (2) the price at which the last in-market resource withdrew from the auction via a de-list bid minus $0.01. *Id.* Secondly, under the settlement, load-serving entities ("LSEs"), essentially electric utility companies, could designate some resources as self-supply: either utility-owned generation facilities or facilities with which the utility had contracted. *Id.* ¶ 20. These self-supplied resources could be used to offset the utility's required share of the Installed Capacity Requirement, even though they participate in the auction at prices below their long-run costs and are thus out-of-market. *ISO New England,*

*Inc.*, 138 FERC ¶ 61,027, nn.99 & 103. Finally, the capacity market was to be subject to a clearing price floor in its first three auctions; the clearing price could not be set below 0.6 times Cost of New Entry. Settlement Order ¶ 19.

The settlement also included features designed to protect against supplier-side market power. While it allowed for several types of de-list bids, where suppliers of capacity resources could exit the market as the price dropped, certain of these de-list bid types were subject to review by the Internal Market Monitor. *Id.* ¶ 28. A static de-list bid is one that allows a utility to exit the auction for a year, but must be submitted before the auction and must be reviewed by the Internal Market Monitor. *ISO New England, Inc.*, 135 FERC ¶ 61,029 n.75. A dynamic de-list bid occurs when a capacity resource exits during the auction without Internal Market Monitor review. *Id.* n.74; *ISO New England, Inc.*, 119 FERC ¶ 61,045 P.35.

C. *Procedural History*

In 2008, ISO-NE held the first two auctions under the FCM regime outlined by the settlement and approved in the Settlement Order and Settlement Rehearing Order. On December 1, 2008, New England market participants submitted a filing proposing that modifications be made to the FCM and calling for stakeholder input. In June 2009, the Internal Market Monitor issued an initial assessment of the capacity market. The third auction took place in October 2009. After a stakeholder process, several market participants submitted on February 22, 2010 proposed FCM changes that would go into effect on April 23, 2010, some three months before the scheduled August 2, 2010 fourth auction. This original proposal sought, among other things, to revise the Alternative Price Rule, extend the price floor beyond the third

auction, and revise the Cost of New Entry calculation. *ISO New England, Inc.*, 131 FERC ¶ 61,065 P.6. The original proposal contemplated that other parameters would need yet additional stakeholder review and input.

FERC issued four orders in connection with these and subsequent proposed changes to the New England capacity market. In the first order, FERC found certain parameters of the proposal to satisfy the "just and reasonable" standard and accepted them as proposed. *ISO New England, Inc.*, 131 FERC ¶ 61,065, Order on Forward Capacity Market Revisions and Related Complaints, April 23, 2010 ("First Order") ¶ 16. FERC set other issues for paper hearing, but made the proposed changes effective as of the date of the order, April 23, 2010, to provide certainty heading into the fourth auction scheduled for August 2, 2010. *Id.* ¶¶ 17–19. The Commission later issued a second order clarifying certain portions of the First Order. 132 FERC ¶ 61,122, Order Granting in Part and Denying in Part Requests for Clarification and Rehearing and Denying Motion for Disclosure, August 12, 2010 ("Second Order"). On the paper hearing, ISO-NE presented a July 1, 2010 revised proposal outlining changes to the Forward Capacity Market, and various stakeholders responded to both the original and the revised proposal.

FERC issued two orders responding to the revised proposal. 135 FERC ¶ 61,029, Order on Paper Hearing and Order on Rehearing, April 13, 2011 ("Third Order"); 138 FERC ¶ 61,027, Order on Rehearing and Clarification and Order Accepting Compliance Filings, January 19, 2012 ("Fourth Order"). FERC identified "two major and interrelated issues . . . in this case: (1) whether the FCM design in New England will provide sufficient income to incent market entry when necessary without the assistance of

supplemental revenue streams from outside ISO-NE markets and (2) the proper design of market power mitigation regimes to protect against both buyer and seller market power." Third Order ¶ 15. As a result, it found the majority of the proposal unjust and unreasonable, but accepted portions of ISO-NE's July 1, 2010 revised proposal. *Id.* ¶ 16.

FERC found that the proposals did not adequately mitigate buyer-side power in that they failed to provide sufficient regulation of below-cost entry, but also found that a component of the revised proposal based on "benchmark pricing" could lead to a just and reasonable buyer-side mitigation measure. *Id.* ¶¶ 17, 165. Significantly, the Commission ordered ISO-NE to develop a minimum-offer price rule ("MOPR" or "offer-floor mitigation") specific to resources' asset class. FERC "require[d] ISO-NE to work with its stakeholders to develop a mitigation regime that relies on these benchmarks but does not procure more capacity than [the Installed Capacity Requirement], that is, to develop an offer-floor mitigation construct . . . ." *Id.* ¶ 165.

FERC found it inappropriate to adopt a categorical mitigation exemption for state-sponsored and self-supply entities, Third Order ¶¶ 170–71, but nothing in the order eliminated any right that entities might have to request mitigation exemptions, Fourth Order ¶ 91. The Commission extended the price floor through Auction 6, but did not further mitigate resources that had been deemed below-cost in the first five auctions once the MOPR construct was in place. Third Order ¶ 217.

FERC found that the proposals also failed to adequately mitigate supplier-side power. The Commission lowered the dynamic de-list bid price to $1/kilowatt-month, requiring de-list bids over this price to be subject to review by the Internal

Market Monitor.  Third Order ¶ 313; Fourth Order ¶¶ 121–28.

D. *Petitions for Review*

Before us, Petitioners NSTAR and Public Systems challenge the buyer-side mitigation measures as going too far. Public Systems first contends that FERC lacks jurisdiction under the FPA to impose mitigation requirements upon uneconomic entrants to the Forward Capacity Market.  Both NSTAR and Public Systems go on to argue that, assuming jurisdiction, FERC's orders imposing mitigation requirements in order to produce just and reasonable rates were not based on substantial evidence.  Finally, NSTAR and Public Systems assert that the Commission acted arbitrarily and capriciously in declining to create a categorical mitigation exemption for self-supplied and state-sponsored resources.

Conversely, petitioners NEPGA and Suppliers challenge the buyer-side mitigation measures as too lenient, while contending that the supplier-side mitigation measures are too harsh.  On the buyer-side measures, they first argue that FERC acted arbitrarily and capriciously in declining to regulate uneconomic entrants from Auctions 1–5 in later auctions using the offer floor mitigation scheme.  Secondly, they argue that the Commission erred in determining which resources constitute new import resources subject to offer-floor mitigation.  Regarding the seller-side measures, they claim that it was arbitrary and capricious for FERC to lower the dynamic de-list price to $1/kilowatt-month.

We consider each allegation in turn.

## II.  STANDARD OF REVIEW

This Court reviews final orders issued by the Commission under the arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).  An agency action will be upheld if the agency "articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  The Commission's factual findings will be upheld if supported by substantial evidence.  16 U.S.C. § 825*l*(b).

The question of an agency's interpretation of a statutory ambiguity that concerns the scope of the agency's authority is reviewed under the *Chevron* standard.  "[T]he question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not."  *City of Arlington, Tex. v. FCC*, __ U.S. __, __, 133 S. Ct. 1863, 1871 (2013).

## III. DISCUSSION

### A.  *FERC's Jurisdiction*

We begin by noting that the Settlement Order and Settlement Rehearing Order in this case entertained concerns over whether FERC had jurisdiction over the settlement.  However, the Settlement Orders were devoted to considering the broad issue of FERC's jurisdiction to regulate charges for capacity as opposed to wholesale energy.  Settlement Order ¶ 201 (collecting cases in which "[c]ourts have confirmed that the Commission has jurisdiction under the FPA to regulate the charges for capacity in wholesale markets").  The Settlement

Orders did not consider the precise jurisdictional question before us.

Our question is whether FERC has jurisdiction to regulate capacity where its regulation touches on which energy facilities may be used to fulfill capacity obligations. Public Systems argue that FERC exceeded its jurisdiction when it imposed buyer-side mitigation measures because the orders serve to dictate which resources a utility must use to satisfy its capacity obligations, in violation of the FPA. Intervenor Connecticut joins Public Systems' jurisdictional argument, contending that FERC's orders impermissibly determine the makeup of a state's resource portfolio.

Under 16 U.S.C. § 824(b)(1), "[t]he Commission shall have jurisdiction over all facilities for such [interstate] transmission or sale of electric energy, but shall not have jurisdiction . . . over facilities used for the generation of electric energy . . . ." Said another way, states regulate facilities, while FERC regulates sale and transmission. We have previously held that the Commission has jurisdiction to regulate certain parameters of the capacity market related to the price of capacity, even if those determinations touch on states' authority. *See, e.g.*, *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 481–83 (D.C. Cir. 2009) (FERC may regulate Installed Capacity Requirement as it affects FERC jurisdictional rates, even if the requirement could result in the construction of facilities, a matter under state jurisdiction); *Municipalities of Groton v. FERC*, 587 F.2d 1296, 1300–03 (D.C. Cir. 1978) (FERC approval of a capacity deficiency charge does not encroach on state jurisdiction, even though it

may "motivate [utilities] to develop sufficient capacity to meet their load requirements").[2] We do so again here.

Out-of-market resources—whether self-supplied, state-sponsored, or otherwise—directly impact the price at which the Forward Capacity Market auction clears. As the price of capacity is indisputably a matter within the Commission's exclusive jurisdiction, FERC likewise has jurisdiction to mitigate buyer-side market power as to out-of-market entrants. We agree with the Commission's finding that it has jurisdiction over mitigation matters "affecting or relating to wholesale rates" under FPA § 201 and 206. Third Order ¶ 220 (emphasis omitted) (citing *Conn. Dep't of Pub. Util. Control*, 569 F.3d at 478, 481). We stress that FERC's mitigation measures here do not entail direct regulation of facilities, a matter within the exclusive control of the states. *See* 16 U.S.C. § 824(b)(1). The Commission also found that uneconomic entry, regardless of resource and regardless of intent, "can produce unjust and unreasonable prices by artificially depressing capacity prices." *Id.* ¶ 170. As it is FERC's statutory obligation to ensure that rates are appropriate, we must respect its decision to maintain just and reasonable rates through curbing or mitigating buyer-side market power. *See* Fourth Order ¶ 79 ("By regulating the mechanism that ultimately produces the capacity clearing price, the Commission is properly exercising its jurisdiction over rates, terms and conditions of service.").

Public Systems' and Intervenor Connecticut's arguments largely rest on the proposition that the Commission is

---

[2] However, we have never held, and do not now hold, that regulation related to the price of capacity is within FERC's authority if it entails direct regulation of generation facilities. Such matters are the province of the states. 16 U.S.C. § 824(b)(1).

improperly regulating "facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1). However, their arguments fail: states remain free to subsidize the construction of new generators, and load serving entities to build or contract for any self-supply they believe is necessary; FERC's orders simply regulate the "price constructs that result in offers into the capacity market from these resources that are not reflective of their actual costs." Third Order ¶ 170.

Moreover, this Court has already rejected in *Connecticut Department of Public Utility Control* the argument that the type of regulation at issue here constitutes "direct regulation of generation facilities." 569 F.3d at 481–82. There, we held that FERC had jurisdiction to regulate "a key input into the market-based mechanism." *Id.* at 478. Just so here. This mitigation parameter operates no differently.

FERC's rate-making authority confers broad power "to act in the public interest." *Miss. Indus. v. FERC*, 808 F.2d 1525, 1549 (D.C. Cir. 1987) (internal quotations omitted), *vacated and remanded in part on other grounds*, 822 F.3d 1104 (D.C. Cir. 1987). We hold that FERC has jurisdiction to regulate the parameters comprising the Forward Capacity Market, and that applying offer-floor mitigation fits within the Commission's statutory rate-making power.

B.  *Buyer-Side Mitigation*

As we have discussed, the orders on review address buyer-side market power by imposing a number of mitigation measures. Essentially, the arguments before us on each of the buyer-side mitigation measures are these: Petitioners NSTAR and Public Systems contend that FERC went too far in its measures designed to stop uneconomic entry. Petitioners NEPGA and Suppliers argue that FERC did not go far enough

in preventing this buyer-side market power. The Commission argues that it struck the appropriate balance.

### 1.   Necessity of Buyer-Side Mitigation Measures

The Commission bears the statutory responsibility of ensuring that rates are just and reasonable. Therefore, our first consideration is whether FERC's mitigation measures against buyer-side market power were undertaken in the establishment of just and reasonable rates. NSTAR argues that they were not. It contends that FERC erred in ignoring the settlement in place in this case, that its orders were not supported by substantial evidence, and that it acted arbitrarily and capriciously in imposing buyer-side mitigation. Similarly, Public Systems argue that FERC erred in its determination that self-supply artificially depresses capacity prices, causing the Commission's mitigation measures to be unreasonable. We disagree with both sets of Petitioners and hold that FERC reasonably mitigated buyer-side market power.

In its orders, the Commission determined that neither of ISO-NE's proposals based on the Alternative Price Rule would result in just and reasonable rates, due to the exercise of buyer-side market power. Third Order ¶¶ 17–19, 59–61. The Alternative Price Rule is a mitigation tool intended to discourage buyers from suppressing market clearing capacity prices below a competitive level, and to ensure that the price of capacity is truly reflective of the cost of new entry into the market. By design, the Rule is to provide an upwards price adjustment for out-of-market resources. In practice, however, the Commission found that the Alternative Price Rule failed to adequately address the price suppressive effect of capacity that entered the market through below-cost auction bids, due to having too narrow a triggering mechanism. *Id.* ¶¶ 17–19,

59. The Rule was only set to trigger when the Installed Capacity Requirement was higher than the amount of existing capacity, and thus there was a need for new capacity to make up the difference. First Order ¶ 70. However, new capacity may be needed in scenarios other than meeting the Installed Capacity Requirement, such as to replace existing capacity entering retirement. *Id.* Further, the Commission found, the Alternative Price Rule did not account for out-of-market resources that affect prices even when no new capacity is needed, by displacing other price-setting resources. *Id.* Indeed, the Rule was never triggered in the New England auctions despite the entrance of significant amounts of out-of-market capacity. Third Order ¶ 58. FERC specifically found that "[out-of-market] capacity suppresses prices regardless of intent," *Id.* ¶ 170, and necessitates action by the Commission to correct for unjust and unreasonable outcomes.

Even in rejecting ISO-NE's proposals, the Commission did find that one element of the revised proposal, the principle of benchmark pricing, "form[ed] the basis for a just and reasonable buyer-side mitigation measure." *Id.* ¶ 165. Under this approach, the Internal Market Monitor would establish resource-specific benchmark prices approximating the cost of new entry into the market. *Id.* ¶¶ 165, 169. Bids below a specified percentage of the relevant benchmark would be deemed uneconomic and would be subject to mitigation. The Commission therefore required ISO-NE "to work with its stakeholders to develop a mitigation regime that relies on these benchmarks but does not procure more capacity than [necessary], that is, to develop an offer-floor mitigation construct . . . ." *Id.* ¶ 165. Under the offer-floor mitigation scheme, if the clearing price falls below the set benchmark, the new resource would not clear in the auction and would not obtain a capacity supply obligation. *Id.* ¶¶ 165–69.

According to NSTAR, there is no evidence that the Alternative Price Rule is not working as designed to mitigate out-of-market entry. The Alternative Price Rule, NSTAR argues, should be aimed at preventing buyers from intentionally depressing capacity prices. It is true that the New England capacity market suffers from the exercise of buyer-side market power specifically at the hands of those interested in depressing capacity prices. However, NSTAR views too narrowly the circumstances in which the Alternative Price Rule is designed to operate. The Commission found that capacity offered into the market through below-cost bids can suppress prices even when no actor has the intent to do so. Third Order ¶ 170 ("[Out-of-market] capacity suppresses prices regardless of intent . . . ."); *see also N.Y. Indep. Sys. Operator, Inc.*, 124 FERC ¶ 61,301 P.29 (2008). The Alternative Price Rule "is a market power mitigation rule intended to discourage buyers who have the *incentive and ability* to suppress market clearing capacity prices below a competitive level from doing so," not simply the intent to do so. First Order ¶ 69 (emphasis added). FERC stated that its objective is "to ensure that the prices in capacity markets reflect the market cost of new entry when new entry is needed." *Id.* However, the Commission "agree[d] with the [External Market Monitor] and the commenters that ISO-NE's existing [Alternative Price Rule] does not fully meet this objective." *Id.* ¶ 70.

Such a finding that the Rule is not working was based on substantial evidence. The External Market Monitor found that "[out-of-market] capacity can lead to a clearing price in the [auction] that is inefficiently low" and "can distort . . . prices by shifting the supply in the [auction] such that a bid with a substantially lower bid price . . . sets the clearing price." External Market Monitor (Potomac Economics) Report at 4–6. In declining to accept the proposed

amendments to the Alternative Price Rule, the Commission relied also on the External Market Monitor's finding that "the proposed [Alternative Price Rule] changes fail to trigger when new capacity is not needed or when the [out-of-market] quantity is less than the amount of new capacity needed, even though in both cases [out-of-market] capacity can substantially lower prices without an [Alternative Price Rule] adjustment." First Order ¶ 50; External Market Monitor (Potomac Economics) Report at 14–15.

In short, the Alternative Price Rule would not be triggered in all the scenarios necessary to produce just and reasonable rates. "[T]he existing [Alternative Price Rule] provides a price adjustment for [out-of-market] resources only when there is a need for new capacity as reflected by an [Installed Capacity Requirement] that exceeds all existing capacity." First Order ¶ 70. The Rule would not be triggered when new capacity is needed because existing capacity is retiring, or when uneconomic capacity would displace "what would otherwise be the marginal, price-setting existing resource." *Id.* Moreover, even in those circumstances where the Rule would be triggered, it would not produce the same price that would have arisen had all the out-of-market entrants offered capacity truly reflective of their long-run costs. *Id.* Upon evidence that the Alternative Price Rule failed to capture all of the instances of price-shifting out-of-market capacity, FERC acted within its authority to adjust parameters of the settlement and in fact "has a continuing obligation to ensure that . . . rates are just and reasonable." *OXY USA, Inc. v. FERC*, 64 F.3d 679, 690 (D.C. Cir. 1995) (internal quotation marks omitted).

Likewise, we defer to the Commission's decision to mitigate buyer-side power because its determination was not arbitrary or capricious, but instead a proper exercise of its role

in balancing competing interests. FERC evaluated the relative importance of several parameters—allowing uneconomic resources to clear the market, preventing uneconomic resources from distorting the market clearing price, and limiting the purchased capacity to the Installed Capacity Requirement—and reasonably determined that it was more important to prevent price distortion and excess capacity purchase than it was to allow out-of-market resources to clear. Third Order ¶¶ 159–66; Fourth Order ¶¶ 28, 75. Such a juggling act would not benefit from our rearranging. *See, e.g.*, *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 541–42 (D.C. Cir. 2010) (the court "properly defers to policy determinations invoking the Commission's expertise in evaluating complex market conditions," where the Commission "reflected on the competing interests at stake to explain why it struck the balance it did") (internal quotations omitted).

We are also unconvinced by Public Systems' contentions concerning buyer-side mitigation in the context of self-supplied resources. They argue that lower prices are the natural result of the increased supply of capacity now available as states and other entities can produce or contract for their own capacity. For the reasons already discussed, FERC sufficiently explained how the Alternative Price Rule as contemplated in the settlement does not adequately adjust prices or prevent out-of-market resources from distorting prices irrespective of motivation. That conclusion does not change in consideration of the out-of-market resource's status as self-supplied.

2. Categorical Mitigation Exemption

If there is to be mitigation of buyer-side market power, Petitioners contend, some resources—those which are self-

supplied and those which are state-sponsored—should be categorically exempt. We again defer to the Commission's reasoned determination to the contrary.

We first decide that the question of categorical mitigation exemptions is ripe for review. FERC contends that this issue is unripe because ongoing agency proceedings will consider mitigation exemptions for these resources. Respondent's Br. at 4–8. However, states and LSEs are currently harmed by their inability to develop their portfolios for future years, as they are acting pursuant to orders declining to exempt them from mitigation. Moreover, since the completion of the briefing in this case, FERC has gone on to deny proposed tailored exemptions for both self-supplied and state-sponsored entities. *See* Public Systems' Rule 28(j) letter at 2. In light of these factors, there is no reason to stay our consideration of the issue.

Public Systems argue that allowing LSEs to choose which resources they will use to fulfill their capacity obligations is a cornerstone of the settlement in this case, and that the mitigation measures prevent them from electing to self-supply capacity because their bids will not clear the market. Intervenors New England Commissioners agree and argue that the Commission acted arbitrarily and capriciously when it failed to meaningfully consider the states' request for a categorical exemption for state-sponsored resources, which are unlikely to be used for the purpose of suppressing capacity prices.

It is true enough that, under the settlement, self-supplied and state-sponsored resources are available to fulfill capacity obligations, provided that they adhere to "the same performance obligations and qualification requirements as other resources participating in the [Forward Capacity

Market] and the [auctions.]" *See* Settlement Order ¶ 20. However, FERC did not act arbitrarily and capriciously in determining that new self-supplied resources should meet the additional burden of mitigation and should not be categorically exempt. Rather, it recognized the need for modification of the existing mitigation schemes in response to the failings of the Alternative Price Rule as applied to all uneconomic entry, including self-supplied and state-sponsored resources, and mitigated accordingly.

The Commission found that designating a new resource as self-supply "has the same price effect as offering the . . . resource [into the auction] at a price of zero." Fourth Order ¶ 60. This low price will serve to displace a higher-priced resource that otherwise would have set the clearing price; as a result, a lower offer will then set the clearing price. *See id.* ¶ 72. This is definitional market distortion in favor of buyers. Further, it is the same market distortion that the Alternative Price Rule failed to correct, necessitating the introduction of the offer-floor mitigation scheme. Why then would identical distortions be treated differently?

Simply, we uphold the Commission's determination that because self-supply serves to depress capacity prices, a categorical exemption from mitigation is unwarranted. To categorically exempt new self-supplied resources "would allow the mitigation mechanism to be circumvented" and result in unjust and unreasonable rates. *Id.* ¶ 60. FERC is within its jurisdiction to consider the economic, as well as the technical, attributes of a capacity resource.

We note that, in any event, the mitigation measures do not apply to *existing* resources, *id.* ¶ 74, leaving current self-supply purchasing decisions undisturbed and allowing state-sponsored projects already in the market to fulfill capacity

obligations, *id.* ¶ 88. LSEs are free to shape their portfolios as they choose, including with new self-supplied resources, "provided these new resources clear the auction." *Id.* ¶ 74. Though the Commission has not yet approved any proposals, the orders also permit parties an opportunity to develop appropriately tailored exemptions for self-supplied and state-sponsored resources through the stakeholder process. *See id.* ¶¶ 70, 91. Finally, the Commission "reiterate[d] that state parties have the statutory right under [FPA] section 206 to file to . . . seek[ ] an exemption . . . ." *Id.* ¶ 89.

Public Systems attempt to persuade us that FERC could adopt a system wherein self-supply—often renewable energy technology—is prevented from affecting the Forward Capacity Market clearing price but is still allowed to displace other, less competitive resources. Perhaps so. However, the Commission reasonably determined that self-supply negatively affects prices, and reasonably acted to balance competing interests. In this instance, the Commission chose to value most strongly the concept of preventing price distortion; unfortunately for Public Systems, that decision came at the expense of their uneconomic resources' ability to enter the market. FERC made the judgment that encouraging renewable energies was less important than allowing such out-of-market entrants to depress capacity prices. Such is FERC's prerogative. That it is unfortunate does not make it arbitrary.

FERC's considered conclusion that certain resources, by definition, depress capacity prices falls within its duty of ensuring that rates are just and reasonable. Third Order ¶ 170. We defer to the Commission's decision to decline a categorical mitigation exemption for self-supplied and state-sponsored resources.

3. Declining to Subject Auction 1–5 Uneconomic Entrants to the Further Mitigation

We turn now to those issues in which a separate set of Petitioners asserts that the buyer-side mitigation measures did not go far enough to address uneconomic entry and the attendant capacity price distortion.

While the proposals at issue in the case came under review by the Commission, the Forward Capacity Market marched on, holding three auctions, with Auctions 4 and 5 soon to follow. During and after the first three auctions, FERC considered and rejected two ISO-NE proposals on buyer-side mitigation as unjust and unreasonable. Third Order ¶¶ 61–62 (rejecting original proposal); *id.* ¶¶ 159–64 (rejecting revised proposal). Having decided in the Third Order that the Alternative Price Rule was insufficient to curb buyer-side market power, the Commission directed development of the offer-floor mitigation scheme for future auctions. At that point in issuing the Third Order, FERC was left with a decision on whether to mitigate further those out-of-market entrants who had obtained capacity in Auctions 1–3 and might well do so in Auctions 4 and 5. Ultimately, FERC extended the clearing price floor of 0.6 times Cost of New Entry that had been in place for the first three auctions, Settlement Order ¶ 19, through Auction 6, but declined to apply any other mitigation measures to uneconomic entrants in Auctions 1 through 5. Third Order ¶¶ 214–17, n.146; Fourth Order ¶¶ 38–46. Of course, having just been conceived, the offer-floor mitigation construct was not yet in effect in any of Auctions 1–5, and thus was not a viable mitigation mechanism.

NEPGA and Suppliers argue that FERC should have applied mitigation, beyond merely extending the price floor,

to the uneconomic entrants in Auctions 1–5 until the minimum offer price rule went into effect. They claim that FERC's finding that the Alternative Price Rule was inadequate is overwhelming evidence that additional mitigation was necessary. Due to the Commission's failure to mitigate, the rates in future auctions will be affected and will therefore be unjust and unreasonable in violation of the FPA. However, our view is that FERC offered well-supported reasons in declining to further mitigate as to each of the auctions in question.

As the Commission noted, the fundamental purpose of buyer-side mitigation is to prevent uneconomic entry, and further mitigation of out-of-market resources already in the market would not serve that end. Third Order ¶¶ 21, 214–15, n.151 (citing *N.Y. Indep. Sys. Operator*, 122 FERC ¶ 61,211 PP.100–01, 118–19); Fourth Order ¶ 39. Instead, further mitigation would send inappropriate price signals, such that older, higher-cost resources would remain in the Forward Capacity Market during a time of capacity surplus. Fourth Order ¶ 39. For these two reasons, FERC declined to further mitigate uneconomic entrants from Auctions 1–3.

FERC found that the same rationale—inability to prevent uneconomic entry through mitigation—applied equally to those resources deemed out-of-market in Auctions 4 and 5, as the newly-minted offer-floor mitigation construct would not go into effect until after those auctions had taken place. Fourth Order ¶¶ 45–46. In addition, there was a notice problem as to these interim uneconomic entrants: FERC had tentatively accepted the original mitigation proposal to provide certainty for Auction 4, but did not issue a final rejection of the original mitigation proposal until after the fourth auction and just before the fifth auction. *Id.* Participants in these auctions, even with some awareness that

the Commission was considering stronger mitigation rules, could not adjust their offers effectively.

NEPGA is correct when it tells us that FERC's duty is to ensure that rates are just and reasonable, not ensure equitability between participants. Pet'rs Br. at 35–36. However, that the Commission also considered notice and fairness is hardly a reason to discredit its decision on the amount of mitigation to impose. The Commission reasonably determined that, in addition to inability to deter entry, fairness concerns militated in favor of declining further mitigation as against these interim out-of-market resources. The Commission ruled that the entry and notice concerns were removed beginning with Auction 6 and thus, going forward, FERC did provide for mitigation of uneconomic entrants; the Commission found that uneconomic "resources entering in [Auction] 6 or any subsequent [auctions] prior to the implementation of the new rules will be carried forward under the existing rules and treated as new in the first auction in which offer floor mitigation is put into place." Fourth Order ¶ 47.

Intervenor PSEG argues that FERC should not have considered whether its mitigation measures would encourage older resources to stay in the market. However, this type of decision is precisely the sort of policy matter FERC is charged with considering. Again, we defer to FERC's expertise, as the agency is best equipped to manage competing policy rationales.

4. Subjecting only Certain Import Resources to the Offer-Floor Mitigation Construct

Some resources did escape FERC's mitigation measures. In the orders on review, FERC required buyer-side

mitigation—that is, application of the offer-floor construct—of capacity originating outside the New England market in limited circumstances. These so-called imports are subject to mitigation only when both of two conditions are met: (1) "a specific new external resource is identified as the sole support for the import;" and (2) "a significant investment (such as the construction of a new transmission line to import power from an adjacent control area) is made to provide capacity to New England." Third Order ¶ 191.

Petitioner NEPGA and others proposed an alternative standard that would have mitigated imports that satisfied either condition. NEPGA and Intervenor PSEG contend that FERC's mitigation of only certain import resources was arbitrary and capricious. According to them, FERC's standard allows too many resources to avoid mitigation, resulting in the introduction of "unneeded capacity into the New England market," Fourth Order ¶ 98, which "can produce unjust and unreasonable prices by artificially depressing capacity prices," Third Order ¶ 170.

The Commission determined that when imports involve "new resources that are devoted to the New England market over the long term," they should "be treated like new internal resources for mitigation purposes." *Id.* ¶ 191. That is, imports committed to New England should be no different than new internal resources committed to New England; they should be mitigated because potential for buyer-side market power is high. However, FERC did not provide a blanket policy on mitigation of imports as is feasible between new and existing internal resources. In response to the "significantly more complicated" task of categorizing new and existing import resources, Third Br. of ISO-NE before FERC at 44, FERC put into place a workable standard to identify those resources that actually support an import and

therefore should be treated as a new resource. Therefore, we defer to its standard.

Further, the Commission responded to NEPGA's alternative proposal to impose mitigation when only one of the two factors is met, and found it would be "contrary to the principles of open access and non-discrimination" among resources. Fourth Order ¶ 98. Such a system would unfairly differentiate between internal and external resources, as well as between service provided by new and existing transmission facilities. *Id.*

NEPGA disagrees with FERC's open-access and discrimination rationales, but cannot demonstrate that they are arbitrary and capricious. FERC's standard on mitigating imports was reasoned and supported by the record, namely ISO-NE's undisputed submission that "the 'new' versus 'existing' distinction should be avoided for imports where possible, and should be based on more concrete distinctions when differentiation is necessary." Third Br. of ISO-NE before FERC at 44 (responding to First Order and Second Order). FERC found that it should, in essence, err on the side of caution in mitigating import resources, and determined that most imports should be treated like existing, rather than new, resources. The Commission was aware of, and considered, the effect such a decision would have on capacity prices. Such a balancing function is precisely the role of expert agencies, and the record provides no basis on which FERC's decision should be disturbed.

## C. *Supplier-Side Mitigation*

Finally, we turn to the claim by NEPGA and Suppliers that FERC improperly constricted the ability of suppliers to withdraw from the Forward Capacity Market. FERC, of

course, contends that its supplier-side mitigation measure—lowering the dynamic de-list bid threshold—was also striking a balance between interests. We agree.

We briefly review the dynamic de-list concept. A dynamic de-list bid is one allowing a resource to exit an auction as the capacity price drops, and is not subject to review by the Internal Market Monitor. In the proposals put forth here, ISO-NE proposed to lower the threshold price at which de-list bids are reviewed by the Internal Market Monitor, so that more bids would be reviewed and the potential for supplier-side market power would be lessened. In its proposal, ISO-NE explained that the existing dynamic de-list bid threshold of 0.8 times Cost of New Entry was not representative of a resource's costs. Third Order ¶ 305 ("ISO-NE notes that the current threshold of 0.8 [times the Cost of New Entry] bears no particular relationship to a resource's opportunity or going forward costs and is a reasonable threshold only under the former approach to determining zones . . . ."). Without review by the Internal Market Monitor, a de-list bid at 0.8 times Cost of New Entry could not be assured to be competitive and allowed to set zonal prices in an auction.

To ensure that the Forward Capacity Market is competitive, review of bids by the Internal Market Monitor is required; thus, suppliers should only be permitted to exit via dynamic de-list bids, and escape Internal Market Monitor review, at amounts low enough that the exercise of supplier-side market power is unlikely. ISO-NE proposed that the threshold be set at $1/kilowatt-month instead. It arrived at this number using the lowest clearing price of three capacity reconfiguration auctions in the New England Market. In a reconfiguration auction, resources seeking to reduce their capacity supply obligations trade with resources willing to

take on those obligations. Because reconfiguration auctions, unlike the garden-variety capacity auctions thus far discussed, have no floor price, a reconfiguration auction's clearing price represents a competitive market price. Therefore, reconfiguration auctions serve as a reasonable proxy for a capacity price.

NEPGA and Suppliers argue that FERC was arbitrary and capricious in lowering the de-list threshold: it mitigated seller-side market power that it never found existed, inappropriately decoupled the de-list threshold from Cost of New Entry, and borrowed its structure from a reconfiguration auction rather than a capacity auction. FERC's careful consideration of the de-list process survives all these complaints.

The impetus for the Commission's decision to accept ISO-NE's proposal to lower the de-list bid amount was the New England market's move to a zonal modeling system in its capacity market pursuant to the settlement. In this system, the market responds to the amount of capacity needed in each of New England's eight load zones. Internal Market Monitoring Unit Review of the Forward Capacity Market Auction Results and Design Elements, ISO New England Inc. Market Monitoring Unit (June 5, 2009) at 13, 17, available at http://iso-ne.com/markets/mktmonmit/rpts/other/fcm_report_final.pdf. If a zone's projected capacity is below its requirements, that zone is "modeled" as a separate zone and allowed to have a higher clearing price in the auction than the rest of the market. First Order ¶ 131. As a result, high de-list bids are in the position to set clearing prices, but were not reviewed by the Internal Market Monitor.

In undertaking to ensure that rates are just and reasonable, the Commission properly lowered the de-list threshold. That ISO-NE and the Internal Market Monitor agree with this decision underscores its reasonableness. All of these parties determined that increased review of de-listing is necessary given the move to a zonal modeling system, because suppliers are incented to withhold their capacity to create a separately modeled zone with a higher clearing price. Fourth Order ¶ 123. It is irrelevant that de-list bids were not previously wielded as market power because the zoning system dramatically changes the Forward Capacity Market. The orders' de-list price of $1/kilowatt-month was also reasonable; the threshold reflects one at which supplier-side market power is unlikely to be exercised and thus Internal Market Monitor review is not necessary, as reflected in the reconfiguration auction results.

In setting this price, FERC agreed with ISO-NE that the previous level of 0.8 times Cost of New Entry did not represent a competitive de-list bid in the zonal modeling version of the Forward Capacity Market, and thus the dynamic de-list threshold could be decoupled from the Cost of New Entry. Third Order ¶ 315. It responded to parties who disagreed and offered its acceptable rationale:

> A resource's de-list bid is not intended to serve as a price stabilizer; it is intended to represent the offer a competitive supplier would accept voluntarily to commit its resource as a capacity resource. . . . No assurance for cost recovery is made for participating in competitive markets, only an opportunity to do so.

*Id.*

Finally, FERC carefully considered the options for auctions to use as a proxy in setting the de-list price. The Commission found that a reconfiguration auction was a reasonable proxy because it accomplished the goal of finding the offer at which "a competitive supplier would accept voluntarily to commit its resource as a capacity resource." *Id.* ¶¶ 313–15. *See also* Fourth Order ¶ 122.

The dynamic de-list bid is but one option in a constellation of strategies available to a supplier in making cost-effective capacity determinations. We note, as did the Commission, that Suppliers can still submit de-list bids above the threshold, so long as the de-list bids are static and thus presented in advance. Third Order ¶ 313. Further, we take the Commission at its word that the threshold will be updated to account for new information. *Id.* ¶ 314.

We hold that FERC's determination of the dynamic de-list threshold, set in agreement with ISO-NE and the Internal Market Monitor, was neither arbitrary nor capricious. FERC reasonably determined that the zonal modeling system would have such an effect on the Forward Capacity Market, and act to incent suppliers to exercise market power, that preemptively providing for Internal Market Monitor review of most bids was the prudent course of action. FERC adequately explained why Cost of New Entry has become irrelevant to de-list bids, why the reconfiguration auction served as an appropriate proxy, and why the de-list price chosen was likely to prevent the exercise of supplier-side market power. Therefore, the Commission did not err.

**IV. CONCLUSION**

For the foregoing reasons, we deny the petitions for review.

*So ordered.*