# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 6, 2017        Decided February 2, 2018

No. 15-1071

NEW ENGLAND POWER GENERATORS ASSOCIATION, INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PSEG ENERGY RESOURCES & TRADE LLC, ET AL.,
INTERVENORS

---

Consolidated with 16-1042

---

On Petitions for Review of Orders of
the Federal Energy Regulatory Commission

---

*Ashley C. Parrish* argued the cause for petitioner. With
him on the briefs were *David G. Tewksbury*, and *Paul Alessio
Mezzina*. *Stephanie S. Lim* entered an appearance.

*Kenneth R. Carretta* and *Cara J. Lewis* were on the brief
for intervenors PSEG Companies in support of petitioner.

*Ross R. Fulton*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Robert H. Solomon*, Solicitor.

*Jason Marshall* argued the cause for intervenors. With him on the brief were *Joseph Arnold Rosenthal*, *Rachel A. Goldwasser*, and *Clare E. Kindall* and *Robert Louis Marconi*, Assistant Attorneys General, Office of the Attorney for the State of Connecticut. *Michael C. Wertheimer*, Assistant Attorney General, and *John S. Wright*, Attorney, Office of the Attorney General for the State of Connecticut, entered appearances.

Before: SRINIVASAN and WILKINS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: We consider two Petitions for Review challenging Federal Energy Regulatory Commission ("FERC" or "the Commission") Orders denying complaints by two electricity suppliers. *See* Order on Compl., New Eng. Power Generators Ass'n, Inc. v. ISO New Eng. Inc., 146 FERC ¶ 61,039 (2014) ("Initial NEPGA Order"); Order Denying Reh'g & Clarification, New Eng. Power Generators Ass'n, Inc. v. ISO New Eng. Inc., 150 FERC ¶ 61,064 (2015) ("NEPGA Rehearing Order"); Order Denying Compl., Exelon Corp., et al. v. ISO New Eng. Inc., 150 FERC ¶ 61,067 (2015) ("Initial Exelon Order"); Order Denying Reh'g, Exelon Corp., et al. v. ISO New Eng. Inc., 154 FERC ¶ 61,005 (2016) ("Exelon Rehearing Order").

Petitioners challenge four FERC orders that uphold the current iteration of the Tariff that governs electricity rates in New England. To ensure future electricity capacity in New

England, electricity suppliers and distributors transact in a Forward Capacity Market ("FCM"), a yearly auction in which distributors pay suppliers for their production capacity three years in the future. The Tariff, a patchwork of rules and orders adopted by the Independent System Operator of New England ("ISO-NE") and approved by FERC, governs how FCM participants buy and sell future capacity. Petitioners challenge two of the rules, which they contend altered the structure of the FCM to the detriment of Petitioners and other existing suppliers.

Petitioners, the New England Power Generators Association, Inc. ("NEPGA") and Exelon Corporation ("Exelon"), are electricity suppliers who participate in New England's FCM Auction. Because they have participated in the FCM in the past and are not "new entrants," they cannot reap the benefits of the two rules challenged in this case, which benefit only new suppliers. FERC denied complaints filed by each Petitioner under 16 U.S.C. § 825e, and FERC subsequently denied petitions for rehearing. Both Petitioners filed timely appeals. This Court has jurisdiction under 16 U.S.C. § 825*l*(b). For the reasons explained below, the Petitions for Review are granted.

## I.

The Federal Power Act ("FPA") empowers FERC to regulate the sale and transmission of electricity to ensure that electricity is provided at a "just and reasonable" rate. 16 U.S.C. § 824d(a). All rates for or in connection with jurisdictional sales and transmission service are subject to review by FERC to ensure that the rates are just and reasonable and not unduly discriminatory or preferential. *Id.* §§ 824d(e), 824e(a). A public utility first proposes rates with FERC pursuant to section 205 of the FPA, and the utility has the burden to show that its

rate is lawful. *Id.* §§ 824d(c), 824d(e). A negatively affected party can challenge the rate by filing a complaint with FERC, and the challenging party then carries the burden to show that the existing rate has become unjust or unreasonable. *Id.* § 824e(a), (b). If FERC agrees that the rate is unjust or unreasonable, it must establish a new rate.

**A.**

"Capacity is not electricity itself but the ability to produce it when necessary." *Conn. Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477, 479 (D.C. Cir. 2009) (internal quotation marks omitted). Pursuant to the FPA, FERC regulates capacity markets, "which dictate the amount of electricity available for production and transmission when needed." *New Eng. Power Generators Ass'n v. FERC* (*NEPGA I*), 757 F.3d 283, 285 (D.C. Cir. 2014) (citing *Conn. Dep't of Pub. Util. Control*, 569 F.3d at 479). Order Number 888 is the bedrock of FERC's electricity regulatory regime. In that order, "FERC undertook to promote wholesale competition through open access and nondiscriminatory transmission services." *Id.* at 285-86. To accomplish that goal, FERC "encouraged the formation of independent systems operators (ISOs) to administer transmission services and new markets for wholesale electricity transactions." *Sithe/Indep. Power Partners, L.P. v. FERC*, 285 F.3d 1, 2 (D.C. Cir. 2002). ISOs manage the electricity grid on behalf of transmission-owning member utilities, "providing generators with access to transmission lines and ensuring that the network conducts electricity reliably." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 768 (2016).

ISOs provide open access to the transmission lines at rates established by a single tariff. In setting the tariff, ISOs "adopt transmission (and ancillary services) pricing policies to

promote the efficient use of, and investment in, generation, transmission, and consumption of wholesale electric power in specific energy capacity systems." *NEPGA I*, 757 F.3d at 286 (internal quotation marks omitted). Tasked with ensuring the reliability of electric power for their geographic region, ISOs "must implement a scheme that will incent resources to provide sufficient energy capacity." *Id.*

To ensure that there is sufficient electricity to meet demand in the near-term future, ISO-NE administers a Forward Capacity Auction ("FCA"). An FCA is a market where energy suppliers sell their energy capacity to energy distributors three years in advance of a year-long commitment period. Each year, ISO-NE determines the amount of capacity that will be required for system reliability in three years and requires that amount (the installed capacity requirement or "ICR") to be purchased at auction. The auctions are "descending clock" auctions, where the starting price is high and suppliers indicate how much capacity they will provide at that price, then the price decreases in each successive round of the auction resulting in the aggregate quantity of capacity offered by suppliers decreasing as the auction proceeds. The auction is over when the aggregate amount of capacity offered equals the ICR. Suppliers who remain in the auction at that point have "cleared" their bids. They will assume capacity-supply obligations for a one-year period three years in the future and are typically paid the auction-clearing price.

ISO-NE adopted a price "lock-in" rule and a "capacity-carry-forward" rule, both designed to encourage new generating resources – *i.e.*, suppliers – to enter the market. The rules allow new suppliers to "lock in" their first-year clearing prices for up to an additional six years, and require that the capacity of the price-locked resources be offered into the future FCAs for those additional six years, potentially even at a price

of zero. This reduces clearing prices paid to all suppliers, new and existing, by mandating new entrants to submit low bids in the later auctions. The new entrants submit those low bids with the knowledge they will still get paid the lock-in price for their capacity. However, a minimum-offer rule for new suppliers in the entry auction – by which ISO-NE sets a price a new entrant cannot bid below – mitigates any price suppression in the entry auction. *See NEPGA I*, 757 F.3d at 291.

**B.**

NEPGA and Exelon each filed complaints with FERC against ISO-NE under section 206 of the FPA, challenging ISO-NE's Tariff provisions that establish the lock-in and capacity-carry-forward rules. Petitioners challenged the Tariff on the grounds that the provisions result in new suppliers reaping a windfall and existing suppliers getting short shrift in both the entry and post-entry auctions. Petitioners argued that the rates were unduly discriminatory and, thus, unjust and unreasonable because of the interplay of two provisions: (1) the provision allowing new suppliers to lock in a price at their entry auctions that they are guaranteed for a total of seven years; and (2) the provision requiring the new suppliers with a locked-in price to offer their capacity in the post-entry auctions as a price-taker – *i.e.*, requiring the locked-in suppliers to bid their capacity all the way to zero.

FERC denied both complaints with respect to the issues challenged in this appeal.[1] Initial NEPGA Order ¶ 1; Initial Exelon Order ¶ 1. The Commission also denied both

---

[1] FERC granted NEPGA's complaint in part, finding that one aspect of the Tariff resulted in unjust and unreasonable prices paid to existing suppliers, but FERC remedied that by adopting a separate proposal by ISO-NE altering the problematic Tariff provision.

Petitioners' requests for rehearing. NEPGA Rehearing Order ¶ 1; Exelon Rehearing Order ¶ 1. Petitioners argued that the combination of the lock-in rule and the capacity-carry-forward rule rendered the ISO-NE Tariff unjust and unreasonable because of improper price discrimination against existing suppliers. Petitioners relied heavily on a 2009 FERC decision that rejected a proposal to institute lock-in and capacity-carry-forward rules in the Mid-Atlantic market run by PJM, another ISO. Order on Clarification and Reh'g and on Compliance Filings, PJM Interconnection, L.L.C., 128 FERC ¶ 61,157 (2009). In *PJM*, FERC rejected similar lock-in and capacity-carry-forward rules proposed for a different market because the proposals would result in price suppression and discriminatory rates.

Petitioners pointed out two differences in the ISO-NE and PJM markets that they alleged would make the price-suppression effects of ISO-NE's rules worse than the scheme FERC rejected in *PJM*: (1) the PJM lock-in period was only for three years, rather than seven; and (2) the PJM lock-in option was rarely triggered, whereas the lock-in option in New England was available to any new market entrant. Petitioners argued that, consistent with *PJM*, FERC should have either rejected the lock-in and capacity-carry-forward rules, required ISO-NE to eliminate the zero-price offer requirement when it accepted a sloped demand curve, or ameliorated the price suppression for existing suppliers in some other way. Exelon even provided an expert witness, cited in its complaint, who "explained that under the proposed [lock-in] rule, a new entrant will offer at an artificially low level knowing that it will receive up to six additional installment payments in the succeeding FCAs . . . ." Exelon Rehearing Order ¶ 11. The rules resulted in price suppression in the entry auction, according to Petitioners, because the new entrants would lower the capacity

offer-prices, whereas "other suppliers do not receive any payment to make up for the lower price . . . ." *Id.*

FERC's responses to Petitioners' arguments morphed over the course of the nearly two years between the Commission's denial of NEPGA's complaint and its denial of Exelon's rehearing request.

In the denial of NEPGA's complaint, FERC stated that the purpose of the rules is "to mitigate the price suppressing effects of over-procurement in subsequent years, following the procurement of capacity from a new resource that exceeds the amount of new capacity required in a zone." Initial NEPGA Order ¶ 56. FERC went on to explain that it is not possible to know whether the price-lock and capacity-carry-forward rules would suppress prices below competitive levels because "there is not necessarily a link between the capacity carried forward . . . and the amount of excess capacity remaining . . . during the [next six years]." *Id.* ¶ 57. Essentially, FERC said that simply because capacity gets carried forward into future FCAs, it doesn't necessarily follow that the subsequent FCAs will also have excess capacity, and therefore prices might not be suppressed below competitive levels. It also reiterated the purpose of the rules: to ensure ISO-NE would meet capacity-supply needs in the future so that the people of New England would not have power shortages.

FERC responded to the argument that the challenged provisions were substantially similar to the provisions proposed and roundly rejected in *PJM*, and that FERC could not square its rationale from that case with its approval of the lock-in and capacity-carry-forward rules. The Commission disagreed that the pricing provisions pertaining to carried-forward capacity at issue in *PJM* were substantially similar to the capacity-carry-forward rule, including that, "[m]ost

importantly, unlike ISO-NE, PJM use[d] a sloped demand curve in its forward capacity market, which eliminate[d] the need for PJM to uneconomically pro-ration capacity." Initial NEPGA Order ¶ 58.

FERC denied NEPGA's request for rehearing and Exelon's initial complaint on the same day. In the denial of rehearing, FERC tried to clarify aspects of its previous ruling. FERC found that NEPGA's proposal would raise prices and inadequately protect consumers. FERC also rejected the argument that the *PJM* decision required it to alter the ISO-NE Tariff. Because FCM-design is premised on the idea that resources submit offer bids based on going-forward costs, and new entrants typically have lower going-forward costs, FERC stated that "it is efficient for those [new] resources to be selected over older existing resources . . ." NEPGA Rehearing Order ¶ 18. Therefore, FERC:

> [found] it [] appropriate for generators relying on [the price-lock rule] to submit zero-price offers during the lock-in period because zero-price offers are likely to approximate the low going-forward costs of new resources that have incurred most or all of their construction costs by the end of their first commitment year and are . . . less expensive to run than older, less efficient [ones].

*Id.* The Commission noted that simply because *different* prices were paid to new and existing resources under the scheme does not make the Tariff unduly discriminatory. *Id.* ¶ 19. And ISO-NE had adopted the rules based on valid goals: "The Capacity Carry Forward Rule ameliorates the reduction in prices paid to existing resources when the entry of new resources results in excess capacity[,]" and "[t]he New Entrant Pricing lock-in

mitigates price risk." *Id.* FERC denied that its rejection of a similar proposal in *PJM* was dispositive because "market design and rules need not be identical among the regions to be just and reasonable." *Id.* FERC also noted that its accompanying order denying Exelon's complaint would further explain the salient market differences between the ISO-NE and PJM markets.

In denying Exelon's complaint, FERC explained that the combination of the price lock-in and the capacity-carry-forward requirement was efficient:

> When each resource offers to supply capacity at its going-forward costs, the auction can select the set of resources with the lowest costs and reject the set of resources with the highest costs, so that capacity is procured at the lowest total cost. A resource whose construction has recently been completed . . . typically has very low going-forward costs. It is efficient for such a resource to be a price-taker (effectively submitting a $0 price offer) . . . .

Initial Exelon Order ¶ 30. Although FERC agreed that the price-lock and capacity-carry-forward rules would cause lower prices in some circumstances, it stated that Exelon had not met its burden of proving that the rules were unjust and unreasonable. *Id.* ¶ 29. Although the mechanisms used by PJM and ISO-NE similarly resulted in price differentials for new and existing suppliers, FERC was "not persuaded that this difference, in itself, renders ISO-NE's rules unjust and unreasonable." *Id.* ¶ 35.

FERC's rationale was made plain in its denial of Exelon's request for rehearing: that the main factor it earlier asserted

would mitigate price suppression – a vertical demand curve – no longer supported its finding that ISO-NE's Tariff was just and reasonable because FERC had approved ISO-NE's adoption of a sloped demand curve. FERC reiterated that new suppliers – capacity-carry-forward rule or not – would typically offer capacity in post-entry auctions at a price near zero because that reflected the supplier's going-forward costs. Thus, "[b]y allowing sellers to reflect their going-forward costs in their offers, ISO-NE is able to select the most efficient (lowest cost) set of resources, because the low offer prices reflect low going-forward costs." Exelon Rehearing Order ¶ 15. In the alternative, FERC also stated that a lower clearing price "is an acceptable byproduct of a just and reasonable market rule . . . that achieves particular and distinct objectives": (1) incenting new entry into the FCAs to ensure capacity; and (2) protecting consumers from high prices. *Id.* ¶ 16.

The Commission stated that ISO-NE and PJM had "differing clearing mechanics" which made the *PJM* comparison imperfect. *Id.* ¶ 17. Even so, FERC acknowledged and brushed aside the seeming contradiction:

> As the markets have evolved, so too has the Commission's opinion regarding whether zero-price offers from locked-in resources may be just and reasonable. Based on further consideration, the Commission has realized that a zero-price capacity offer from a new [] resource that has cleared in at least one previous auction and has incurred construction costs can be a competitive offer that reflects the resource's going-forward costs, not an attempt to lower . . . prices. Once a new resource clears its initial capacity auction . . . , it has an incentive to ensure that it clears in subsequent

auctions. A zero-price offer strategy is consistent with that incentive.

*Id.* ¶ 18.

**II.**

Section 205(b) of the FPA provides that "[n]o public utility shall . . . maintain any unreasonable difference in rates . . . ." 16 U.S.C. § 824d(b)(2). Section 206(a) of the FPA prohibits undue discrimination. 16 U.S.C. § 824e(a), (b). But "[t]he court will not find a Commission determination to be unduly discriminatory if the entity claiming discrimination is not similarly situated to others." *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 549 (D.C. Cir. 2010). Petitioners bear the burden of showing that the rates are unjust and unreasonable. 16 U.S.C.§ 824e(a); *see also FirstEnergy Serv. Co. v. FERC*, 758 F.3d 346, 353-54 (D.C. Cir. 2014).

To fulfill its mandate to set "just and reasonable" rates, FERC is not "'bound to the use of any single formula or combination of formulae . . . .'" *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 956 (D.C. Cir. 2000) (quoting *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 602 (1944)). Due to practical challenges and myriad divergent interests, FERC "must be given the latitude to balance the competing considerations and decide on the best resolution" in its regulation of electricity markets. *Blumenthal v. FERC*, 552 F.3d 875, 885 (D.C. Cir. 2009). "Congress has entrusted the regulation of the electricity industry to FERC, not to the courts." *Id.* at 884. Therefore, "'[a] presumption of validity . . . attaches to each exercise of the Commission's expertise.'" *Id.* at 884-85 (quoting *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 767 (1968)).

Petitioners contend that they are similarly situated to new suppliers and that the Tariff sets prices that are unduly discriminatory. But if FERC can "reveal[] [a] basis for its contention" that new market entrants were not similarly situated to existing suppliers, the Tariff might well be just and reasonable. *See Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122, 1127 (D.C. Cir. 2011). FERC contends that the Tariff provisions at issue incentivize new entry into the market, provide reliability for future electricity, and lower prices for consumers. The Commission emphasizes that the minimum-price offer rule mitigates the effects of the lock-in and capacity-carry-forward rules by preventing new suppliers from suppressing prices below a reasonable level. *See, e.g.*, *NEPGA I*, 757 F.3d at 291. Petitioners want FERC either to eliminate the Tariff provisions that result in price discrimination between new and existing suppliers or to implement measures to further mitigate the effects of the incentive provisions.

Because we find that FERC failed to offer adequate rationale and explanation in the challenged Orders, we decline to pass on whether Petitioners have met their burden to demonstrate that the rates were unjust and unreasonable. For reasons discussed below, FERC must provide a more robust rationale for its seeming inconsistency with past precedent and practice.

## III.

### A.

While afforded wide latitude in ratesetting due to its expertise and broad statutory mandate, FERC – like all agencies – must engage in reasoned decisionmaking. The arbitrary-and-capricious standard requires the agency to "examine the relevant data and articulate a satisfactory

explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation and internal quotation marks omitted). "It is well established that the Commission must 'respond meaningfully to the arguments raised before it.'" *TransCanada Power Mktg. Ltd. v. FERC*, 811 F.3d 1, 12 (D.C. Cir. 2015) (quoting *Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1008 (D.C. Cir. 2005)).

"It is textbook administrative law that an agency must provide[] a reasoned explanation for departing from precedent or treating similar situations differently." *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) (internal citation and quotation marks omitted) (alteration in original). Although an agency "need not demonstrate to a court's satisfaction that the reasons for [a] new policy are *better* than the reasons for the old one," the agency must "ordinarily . . . display awareness that it *is* changing position." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (emphasis in original). "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* Although case-by-case adjudication sometimes results in decisions that seem at odds but can be distinguished on their facts, it is the agency's responsibility to provide a reasoned explanation of why those facts matter. *See, e.g.*, *BP Energy Co. v. FERC*, 828 F.3d 959, 968 (D.C. Cir. 2016) (vacating finding of no undue discrimination where Commission identified differences between two natural-gas companies but failed to adequately explain why they provide a rational basis for the difference in treatment).

**B.**

On the record before us, we conclude that FERC did not engage in the reasoned decisionmaking required by the Administrative Procedure Act. FERC failed to respond to the substantial arguments put forward by Petitioners and failed to square its decision with its past precedent. In the main, Petitioners argue that the same factors that led FERC to reject similar Tariff mechanisms in *PJM* were substantially exacerbated by the Tariff provisions FERC approved here. FERC did not sufficiently explain its apparent change of position.

Specifically, FERC failed to adequately explain why its rationale in *PJM* – which seems to foreclose signing off on a Tariff scheme like ISO-NE's – does not apply even more forcefully to the scheme it accepted in the Orders below. In *PJM*, the Commission explained that PJM's bid-floor requirement was needed to ensure that a price-locked new entrant "will not reduce [the] price to the existing resources by submitting a $0 bid in Years 2 and 3, knowing that it is guaranteed to be paid its first year bid price no matter what it bids." *PJM*, 128 FERC ¶ 61,157, P. 112. It also found that zero-price bidding would result in unjust and discriminatory pricing. *Id.* The holding and entire rationale of *PJM* strongly suggests that a lock-in mechanism, combined with a capacity-carry-forward rule with a zero-price offer requirement, depresses prices in a way that "adversely affects" existing market participants.

As Petitioners argued, the structural mechanisms of the ISO-NE market appear to exacerbate all of the problems FERC cited for rejecting the similar rule in *PJM*. Petitioners point out multiple ways in which the ISO-NE Tariff seems to exacerbate the type of alleged discrimination FERC had rejected in *PJM*,

including the fact that the lock-in period is seven years and the new market entrants are all *required* to bid their capacity at a price of zero (if necessary) for the duration of that time.

FERC's responses to Petitioners' arguments below amounted to conclusory statements that dismissed Petitioners' concerns without providing reasoned analysis. To respond to Petitioners' main contention that the ISO-NE Tariff rules suppressed prices and discriminated against existing suppliers in a way that the Commission rejected in *PJM*, FERC first stated that conditions in the two markets were different, and then pointed to the vertical demand curve in place at the time under the ISO-NE Tariff. The Commission issued this explanation despite the fact that it issued an order *the very same day* adopting an ISO-NE proposal to start using a sloped demand curve. FERC pointed out that pricing mechanisms need not be the same in different markets. But rather than explain *how* those mechanisms made the PJM proposal unjust but a nearly identical one just and reasonable for ISO-NE, FERC pointed to its accompanying order for further explanation. That explanation consisted of: (1) shifting the burden back to Exelon to show that the ISO-NE rules were unjust and unreasonable; and (2) stating that ISO-NE's price-lock mechanism does a better job of selecting energy suppliers with low going-forward costs. Initial Exelon Order ¶¶ 31, 34. With respect to the possibility of different prices paid to existing resources, FERC simply stated it was not "persuaded that this difference, in itself, renders ISO-NE's rules unjust and unreasonable" and noted that different markets need not have uniform rules for them all to be fair. *Id.* ¶ 35.

It was not until the denial of Exelon's motion for rehearing that FERC even attempted to grapple with Petitioners' arguments based on *PJM*. It did so, once again, with conclusory statements that price suppression is an "acceptable

byproduct of a just and reasonable market rule . . . that achieves particular and distinct objectives in the region" and that "[a]s the markets have evolved, so too has the Commission's opinion regarding whether zero-price offers from locked-in resources may be just and reasonable." Exelon Rehearing Order ¶¶ 16, 18. This belated attempt to distinguish *PJM* after failing to do so in the previous three Orders is inconsistent with reasoned decisionmaking.

A recent case decided by this Court illustrates the point. In *West Deptford Energy*, this Court vacated and remanded a FERC Order that applied a particular Tariff scheme to a generator, the effect of which was to treat the generator differently than other similarly situated generators. 766 F.3d at 20. The panel discussed the requirement that FERC provide an adequate rationale for its decision, especially in light of a then-recent FERC decision expressing a preference for a uniform scheme at odds with its challenged order, which indicated it would make further Tariff adjustments on a case-by-case basis. *Id.* at 20-21. Although the Court reasoned that FERC could likely use the ratesetting scheme at issue, FERC had not explained the seeming inconsistency with past practice. *Id.* Despite FERC's (sometimes persuasive) arguments on appeal, the same is true here.

FERC cites numerous cases to stress the broad array of practical difficulties to balance and interests to consider, including higher consumer prices, reliable price signals, producer flexibility, producer confidence, system reliability, and increasing system capacity and efficiency. FERC explains that the balance it struck here is reasonable because: (1) New England faces a lack of investment in new capacity; and (2) the amended new entrant rule is linked with the sloped demand curve to help ensure that the "demand curve construct overall" will achieve system reliability. Intervenors make an even more

compelling argument that FERC's Orders are just and reasonable, and that Petitioners' proposals would exacerbate other problems in the market. Intervenors also distinguish the PJM and ISO-NE markets, providing more context than FERC did below. FERC contends that it truly has changed its view about the lock-in and capacity-carry-forward rules since its *PJM* decision and even doubled down by suggesting at oral argument that it would be more receptive to the Tariff changes at issue in *PJM* if they were proposed today. *See* Oral Arg. Recording at 25:35-26:26.

All this may be true. But FERC's complex mandate doesn't relieve it of the requirements of reasoned decisionmaking. *See PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 210 (D.C. Cir. 2011) (granting petition for review and remanding for further explanation because "the Rehearing Order[] . . . states that the purpose of the . . . Rule's price floor is to ensure relative market stability during the initial years of the Forward Capacity Market. . . . But once again, the order does nothing more than make the quoted statement; it does not suggest that – let alone explain how – it was a response to PSEG's undue discrimination or policy arguments." (internal quotation marks omitted)). Similarly, FERC must reasonably explain *how* the existing suppliers and new entrants are not similarly situated and in what respects the reasons are material. *See Edison Mission Energy, Inc. v. FERC*, 394 F.3d 964, 968-69 (D.C. Cir. 2005) (vacating FERC ruling that allowed unreasonable price suppression for lack of adequate explanation).

Although FERC may be sincere in its change of heart and, as a substantive matter, correct that its new rationale is just and reasonable, the Commission must provide some analysis and explanation in its Orders regarding why it changed course. As this Court has noted, "we need not – and indeed cannot –

consider 'appellate counsel's *post hoc* rationalizations' for Commission action." *W. Deptford Energy*, 766 F.3d at 25 (quoting *Me. Pub. Utils. Comm'n v. FERC*, 625 F.3d 754, 759 (D.C. Cir. 2010)). "FERC's failure to come to terms with its own precedent reflects the absence of a reasoned decisionmaking process." *PG&E Gas Transmission, Nw. Corp. v. FERC*, 315 F.3d 383, 390 (D.C. Cir. 2003).

## IV.

For the reasons discussed above, we grant the Petitions before us and remand to FERC for further proceedings consistent with this opinion.