# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 9, 2018                 Decided July 24, 2018

No. 16-1068

UTILITY WORKERS UNION OF AMERICA LOCAL 464 AND
ROBERT CLARK,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CPV TOWANTIC, LLC AND NEW ENGLAND POWER
GENERATORS ASSOCIATION, INC.,
INTERVENORS

Consolidated with 16-1408

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

*Daniel J. Sponseller* argued the cause and filed the briefs for petitioners.

*Ross R. Fulton*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *David L. Morenoff*, General Counsel, *Robert H. Solomon*, Solicitor, and *Nicholas M. Gladd*, Attorney.

Before: ROGERS, MILLETT and PILLARD, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*: Petitioners challenge the failure of the Federal Energy Regulatory Commission (FERC or Commission) to account for the effect on electricity prices of the permanent retirement of the Brayton Point Power Station, a coal-fired electric plant in Somerset, Massachusetts. Brayton Point's owners announced the closure just before the New England regional independent system operator ran its eighth annual forward capacity auction (FCA 8)—too late for other wholesale electricity suppliers to participate in the auction and pick up the slack. The resulting constricted supply contributed to a spike in the auction clearing price, to the benefit of the owner's other plants and to the detriment of retail electricity customers. Petitioners and others challenged the closure before the Commission as an attempt to manipulate the results of FCA 8. *See* 16 U.S.C. § 824v; 18 C.F.R. § 1c.2. After the Commission deadlocked and the FCA 8 auction results took effect by operation of law, consumer advocates sought our review. But, in the absence of final agency action, we lacked jurisdiction to consider that petition. *See Public Citizen, Inc. v. FERC*, 839 F.3d 1165 (D.C. Cir. 2016).

Meanwhile, in two later proceedings, petitioners asked FERC to correct for what they assert were effects of Brayton Point's illegal closure on the next two annual forward capacity auctions (FCA 9 and FCA 10). FERC denied the petitions and approved the FCA 9 and FCA 10 results as just and reasonable because "the record [was] devoid of any evidence" that the claimed manipulation in the earlier cycle affected them. *ISO New England, Inc.*, 151 FERC ¶ 61,226, 2015 WL 3810715, at *5-6 (2015); *ISO New England, Inc.*, 155 FERC ¶ 61,273, 2016

WL 3439781, at \*10-11 (2016). Because no record evidence establishes a causal link between the claimed manipulative closure of Brayton Point and the clearing prices of FCA 9 and FCA 10 that FERC approved, we hold that petitioners lack standing to challenge FERC's acceptance of those results.

I.

Petitioners here are the Utility Workers Union of America Local 464 (Union) and its President, Robert Clark. Both Clark and the Union's members are retail electricity customers in New England who claim that high clearing prices for future capacity to generate electricity in FCA 9 and FCA 10 increased the cost of their retail electricity service. They challenge FERC's orders approving the results of those wholesale auctions as just and reasonable under Section 205 of the Federal Power Act (FPA). *See* 16 U.S.C. § 824d. They contend that FERC's determination was contrary to the FPA, and unsupported by substantial evidence or reasoned decision making in violation of the Administrative Procedure Act. *See id.*; 5 U.S.C. § 706(2)(A), (E); *see also* 16 U.S.C. § 825*l*(b).

Petitioners stake their injury on what they claim were inflated capacity prices. Wholesale obligations to stand ready to generate electricity during a specified period if needed— contracts for future "capacity"—are locked in by regional forward capacity auctions held more than three years ahead of time. *See generally New England Power Generators Ass'n v. FERC*, 881 F.3d 202, 205-06 (D.C. Cir. 2018) (describing forward capacity auctions). For example, FCA 8 occurred in February 2014 and determined the capacity supply obligations generators would assume for one year, beginning in June 2017. That three-year lead time exists to "provide for a planning period for new entry and allow potential new capacity to compete in the auctions." *Maine Pub. Utils. Comm'n v. FERC*,

520 F.3d 464, 469 (D.C. Cir. 2008) (quoting *Devon Power, LLC*, 115 FERC ¶ 61,340 at 62,306 (2006)).

The rules governing these auctions are complex. *See generally* ISO-NE Tariff § III.13; Joint App'x (J.A.) 407-41. They provide for simultaneous auctions both for the entire regional system and for various subregions. During the relevant timeframe, the rules allowed a generator to "retire" permanently from the capacity market, excluding it from all future auctions. The rules also included an "administrative pricing" provision that could override auction results if an auction proved insufficiently competitive. In times of "insufficient competition," the Tariff also permitted the Commission to approve higher capacity clearing prices for new entrants to ensure that capacity needs are met. J.A. 38.

The eighth forward capacity auction for the New England power pool, run in February 2014, yielded much higher prices than had the first seven. *See Public Citizen*, 839 F.3d at 1168; *Markets: Results of the Annual Forward Capacity Auctions*, ISO New England, https://iso-ne.com/about/key-stats/markets (last visited July 12, 2018). Market administrators blamed an "abrupt change in the supply-demand balance," caused in large part by a cluster of generators that retired "[w]ell after the deadline for seeking to qualify new resources to participate." Stephen J. Rourke, *ISO New England, Inc. Forward Capacity Auction Results Filing*, Attachment B at 7-8 (Feb. 28, 2014) (J.A. 35-36). The largest of them, accounting for more than half the retiring capacity, was Brayton Point.

When the market administrator sought FERC's approval of the FCA 8 results, petitioners and others protested. They contended that Brayton Point's owners withdrew the plant's capacity too late for the market to attract new suppliers, thereby raising the FCA 8 clearing price to inflate payments to the

owners' other generators, and that those actions constituted illegal market manipulation. *See* Mot. to Intervene and Protest of UWUA Local 464 and Robert Clark, *In re: ISO-NE Eighth Forward Capacity Auction Results Filing*, FERC Dkt. No. ER 14-1409, at 5-8 (Apr. 15, 2014) (*UWUA FCA 8 Protest*); 16 U.S.C. § 824v; 18 C.F.R. § 1c.2. Petitioners offered evidence to show that Brayton Point could have continued to operate profitably, and that its retirement foreseeably earned the owners a windfall at consumers' expense. *See UWUA FCA 8 Protest* at 9-15.

The Commission—acting with only four members at the time—deadlocked two-to-two over whether to approve the FCA 8 results. Because that deadlock did not constitute agency action resolving the issue, the results went into effect "by operation of law." *Public Citizen*, 839 F.3d at 1168. And, absent final agency action, we lacked jurisdiction to review the matter. *Id.* at 1172, 1174. Once the Commission regained a fifth member, the Union renewed its protest of the auction results. More than three years later, FERC has yet to act on that renewed protest.

Meanwhile, preparations began for the following year's auction, FCA 9. Brayton Point, now permanently retired, did not participate. New resources did. *ISO New England, Inc.*, 151 FERC ¶ 61,226, 2015 WL 3810715, at *5-6. Market administrators certified the system-wide auction as competitive (although demand outstripped supply and triggered administrative pricing in one subregion). *Id.* at 62,466, 62,468. FCA 9 yielded prices above the historical baseline, but lower than FCA 8's.

The annual cycle repeated. FCA 10 took place in February 2016 without Brayton Point. More new resources joined the fray, and administrators certified the results as competitive

throughout the entire region. *See* 155 FERC ¶ 61,273, 2016 WL 3439781, at \*2. The clearing price was lower than both FCA 8's and FCA 9's, but above that of prior auctions.

The Commission approved the FCA 9 and FCA 10 results as "just and reasonable" under FPA Section 205, 16 U.S.C. § 824d. *See generally ISO New England, Inc.*, 151 FERC ¶ 61,226, 2015 WL 3810715; *ISO New England, Inc.*, 155 FERC ¶ 61,273, 2016 WL 3439781. Petitioners objected to both decisions, again asking the Commission to scrutinize Brayton Point's retirement for illegal market manipulation. They raised "essentially the same" arguments as before, Pet'rs' Br. 17, and largely incorporated by reference the evidence, adduced in their challenge to FCA 8, that Brayton Point could have continued to operate profitably. The Commission rejected those renewed protests and denied petitioners' requests for rehearing. In approving the FCA 9 results, FERC declined to "consider arguments regarding FCA 8" and was "not persuaded . . . that market manipulation affected FCA 9, as the record is devoid of any evidence to that effect." 151 FERC ¶ 61,226, 2015 WL 3810715 at \*5-6. In the alternative, the Commission saw no evidence that Brayton Point's retirement was improper and disavowed any authority to compel Brayton Point to participate in FCA 9. *Id.* Petitioners' FCA 10 protest, and the Commission's response, largely rehashed the same issues. *See* 155 FERC ¶ 61,273, 2016 WL 3439781.

Petitioners now seek review of the Commission's orders approving the FCA 9 and FCA 10 results. They contend that the Commission erred by failing to credit, further investigate, or refute their evidence that Brayton Point's retirement was illegal market manipulation.

7

II.

Our analysis begins and ends with the threshold question whether petitioners have established standing to challenge the orders under review.  We conclude that they have not.

The "irreducible constitutional minimum" of standing has three parts: injury in fact, causation, and redressability. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)).  The party invoking the federal courts' jurisdiction bears the burden of establishing each of those elements "with the manner and degree of evidence" appropriate to the posture of the litigation. *Lujan*, 504 U.S. at 561.  Where, as here, a case comes to us on a petition directly from an agency, the petitioner's "burden of production . . . is accordingly the same as that of a plaintiff moving for summary judgment in the district court: it must support each element of its claim to standing 'by affidavit or other evidence,'" including whatever evidence the administrative record may already contain.  *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (quoting *Lujan*, 504 U.S. at 561).  To promote orderly adversarial resolution when our jurisdiction may be in doubt, we require petitioners to do the necessary work of "explain[ing] and substantiat[ing]" claims of standing that are not self-evident (and could not be reasonably mistaken as such) in their opening briefs.  *Sierra Club*, 292 F.3d at 900-01; *see* D.C. Cir. Rule 28(a)(4).

The Union asserts associational standing on behalf of its members who are retail electricity customers in the relevant market.  *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977).  Petitioners must establish that either Clark or at least one Union member meets all three requirements for individual standing.  *Id.*; *see Tozzi v. U.S.*

*Dep't of Health & Human Servs.*, 271 F.3d 301, 310 (D.C. Cir. 2001).

Petitioners' claimed injury-in-fact is their actual economic loss from electricity bills they contend were unjustly high. J.A. 169, 353; *see Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 9 (D.C. Cir. 2015). But they must also show "a causal connection between the injury and the conduct complained of," and a likelihood that a favorable decision would redress the injury. *Lujan*, 504 U.S. at 560. The causation element requires evidence of a substantial probability that "the challenged acts of the defendant" caused their injury. *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc); *see Mideast Sys. & China Civil Constr. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172, 1178 (D.C. Cir. 1986). The challenged acts—or, in this case, omissions—at the heart of all of petitioners' claims are the Commission's failures to take account of their evidence and to decide their claim that Brayton Point's retirement constituted illegal market manipulation. *See* Pet'rs' Br. 6, 28; Oral Arg. Rec. 59:10-1:00:20. Petitioners have no other objection to the results of FCA 9 or FCA 10.

In petitioners' view, their evidence and arguments about Brayton Point's retirement were "central to determining the legality of" FCA 9's and FCA 10's higher-than-normal prices. Pet'rs' Br. 28. If Brayton Point's retirement was market manipulation, they assert, it follows that, but for such illegal action, Brayton Point would have participated in FCA 9 and FCA 10. For purposes of assessing standing, we assume petitioners' success on the merits of their claim that, under a lawful state of affairs, Brayton Point would have participated in both auctions. *See LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011). But petitioners still must make some showing that an unlawful Brayton Point retirement in early 2014 skewed the results of the auctions conducted in 2015 and 2016. The

Commission maintains that any such theory is undercut by the economics of the forward capacity marketplace, in which bidders are presumed to respond to relevant variables that change from year to year, including competitors exiting the market. Absent any evidence to establish a "substantial probability" that Brayton Point's retirement affected the results of FCA 9 and FCA 10, *Sierra Club*, 292 F.3d at 902, petitioners have not met their burden to show that the Commission's alleged failure to scrutinize the retirement for potential manipulation played any part in causing any injuries petitioners suffered from those auctions.

A petitioner seeking our direct review of agency action cannot rest on bare assertions; it must "identify in th[e] record evidence sufficient to support its standing to seek review or, if there is none because standing was not an issue before the agency, submit additional evidence to the court of appeals." *Id.* at 899. Petitioners have done neither. They have made only conclusory assertions—both before the Commission and in their briefs—that Brayton Point's absence shifted the results of FCA 9 by "approximately $1 billion" and the results of FCA 10 by "an amount estimated to exceed $400 million." Mot. to Intervene and Protest of UWUA Local 464 and Robert Clark at 6, *In re: ISO New England Inc. Tenth Forward Capacity Auction Results Filing*, FERC Dkt. No. ER 16-1041 (Apr. 14, 2016) (J.A. 357); *see* Pet'rs' Br. 29-30; Pet'rs' Reply Br. 6. They proffer no evidence that Brayton Point's retirement had those claimed effects—or any effect—on the outcomes of FCA 9 and FCA 10. The administrative record contains no supporting data, no market analyses, and no attempts to trace or quantify the impact of Brayton Point's absence. And petitioners' briefing in this court makes no effort to fill that gap—they offer no new affidavits and no explanation of the market dynamics that might support their theory of causation. Indeed, petitioners acknowledged at oral argument that their

briefs provided figures without underlying support, whether by affidavit to us or in the agency record. Oral Arg. Rec. at 23:00-24:50. "[W]e require more than representations of counsel" to establish standing. *Sierra Club*, 292 F.3d at 901.

The FCA 8 proceedings offer an illuminating counterpoint. We do not doubt that electricity consumers had standing to challenge the Commission's handling of Brayton Point's retirement in that proceeding.[1] But that retirement came just before FCA 8, after the deadline for new entrants to participate. That means that the plant's retirement necessarily shrank a finite pool of eligible bidders, and the constricted supply foreseeably elevated the market's clearing price. Petitioners introduced economic analysis to identify and quantify that harm. *See UWUA FCA 8 Protest*, Exhibit A: Affidavit of Paul Chernick. By the time of FCA 9 and FCA 10, however, market actors had had a year or more to respond to the news of Brayton Point's retirement and to offer new capacity in those auctions. Those new entrants' participation may well have offset the loss of available capacity from Brayton Point's retirement; if Brayton Point had participated, those new entrants might not have. Petitioners adduced no expert opinion or other evidence to disentangle and identify a net injury from those crosscutting dynamics. Because petitioners brought forward no evidence of a relationship between Brayton Point's shutdown in claimed manipulation of FCA 8 and the clearing prices in the next two auctions, the causation element of their standing to press their challenges to those auctions is not established.

---

[1] Petitioners' long-pending request that the full Commission revisit Brayton Point's retirement in the FCA 8 proceedings has yet to be resolved. We trust the Commission will give it appropriate consideration without further delay.

It might seem intuitive, given the laws of supply and demand, that the non-participation of a large plant like Brayton Point would exert some upward pull on auction prices. Again, that logic might suffice in relation to FCA 8, given that Brayton Point retired after the deadline for other suppliers to participate in that auction. But in this context, where petitioners challenge successive forward capacity auctions exclusively by reference to events during FCA 8, the link is missing. New England's forward capacity markets, with a cycle of annual auctions conducted three years before generators assume the resulting obligations, are spaced so as to permit the market to account and correct for the events of the previous auction. *See Maine Pub. Utils. Comm'n*, 520 F.3d at 469 (stating that the auctions' design "provide[s] for a planning period for new entry and allow[s] potential new capacity to compete in the auctions"). And the ground rules of each auction are complex, with possible sub-regional pricing differences and administrative pricing overrides to counteract insufficient competition. We cannot simply assume that the results of one auction affect the market-clearing auction price the following year; auction rules give those prior results no direct role in the calculus, and petitioners have provided no evidence of a causal role. In this context, petitioners erred in contending that it fell to FERC to show a lack of effect. *See* Pet'rs' Br. 28-30. Even though our standing analysis assumes, in petitioners' favor, that Brayton Point's retirement was unlawful, it was petitioners' burden to put forward some credible basis for concluding that the retirement reverberated to their detriment in FCA 9 and FCA 10. Because they did not carry it, they have failed to show causation.

12

\* \* \*

In view of petitioners' failure to establish their standing to challenge the final orders at issue here, we dismiss the petitions for review.

*So ordered.*