# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 13, 2018            Decided July 31, 2018

No. 17-1110

NEXTERA ENERGY RESOURCES, LLC, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

CPV POWER HOLDINGS, LP, ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*John N. Estes III* argued the cause for petitioners. With him on the briefs were *John Lee Shepherd*, *Jr.*, *Cara J. Lewis*, and *Abraham Silverman*.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *Robert H. Solomon*, Solicitor, and *Holly E. Cafer*, Senior Attorney.

*Jason R. Marshall* argued the cause for intervenors. With him on the brief were *Phyllis G. Kimmel*, *Larry F. Eisenstat*, *Richard Lehfeldt*, *Clare E. Kindall*, and *Robert L. Marconi*, Assistant Attorneys General, Office of the Attorney General for the State of Connecticut.

*John N. Moore* was on the brief for *amicus curiae* Natural Resources Defense Council, et al. in support of respondent.

Before: WILKINS, *Circuit Judge*, and SENTELLE and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: A group of power generation companies, utility holding companies, and power distribution and sales companies petitions for review of four Federal Energy Regulatory Commission ("FERC" or "the Commission") orders. *ISO New England Inc.* ("*ISO-NE*"), 147 FERC ¶ 61,173 (May 30, 2014), *reh'g denied*, 150 FERC ¶ 61,065 (Jan. 30, 2015); *ISO-NE*, 155 FERC ¶ 61,023 (Apr. 8, 2016), *reh'g denied*, 158 FERC ¶ 61,138 (Feb. 3, 2017). In the orders under review, the Commission approved an exemption to the minimum offer price rule in the ISO New England forward capacity market for a limited amount of qualifying renewable energy. The petitioners argue that the renewable exemption creates unjust, unreasonable, and unduly discriminatory rates in violation of the Federal Power Act and that the Commission was arbitrary and capricious in violation of the Administrative Procedure Act. The petitioners also contend that the Commission erred by not setting a hearing on disputed facts. We conclude that FERC engaged in reasoned decision-making to find that the renewable exemption to the minimum offer price rule results in a just and reasonable rate.

Likewise, FERC did not abuse its discretion by denying the petitioners' request for a hearing. Accordingly, we deny the petition for review.

## I.  Background

This case concerns a petition for review of FERC orders that carve out an exception to the minimum offer price rule for certain qualifying renewable energy resources in the New England energy market. The petitioners, NextEra Energy Resources, LLC, NRG Power Marketing LLC, GenOn Energy Management, LLC, Connecticut Jet Power LLC, Devon Power LLC, Middletown Power LLC, Montville Power LLC, Norwalk Power LLC, NRG Canal LLC, Energy Curtailment Specialists, Inc., PSEG Power LLC, PSEG Energy Resources & Trade LLC, and PSEG Power Connecticut LLC (collectively, the "Generators"), are power generation companies, utility holding companies, and power distribution and sales companies that serve the six-state New England energy market. The Federal Power Act establishes the Commission's authority to regulate wholesale electric rates, such as those determined by the results of the energy markets. 16 U.S.C. §§ 824d-824e.

### A.  The New England Forward Capacity Market

Regional entities, called "independent system operators" or ISOs, operate regional transmission services and foster competition in the market by running auction markets for energy. *See New England Power Generators Ass'n v. FERC*, 881 F.3d 202, 205-06 (D.C. Cir. 2018). ISO New England Inc. is the system operator for the New England region.

ISO New England administers a forward capacity market for the region. It conducts the forward capacity market

pursuant to rules set out in a jurisdictional tariff approved by FERC. The features of ISO New England's complex forward capacity market have been the subject of multiple petitions for review. *See, e.g.*, *Public Citizen, Inc. v. FERC*, 839 F.3d 1165 (D.C. Cir. 2016); *New England Power Generators Ass'n v. FERC*, 757 F.3d 283 (D.C. Cir. 2014) ("*NEPGA*"); *Connecticut Dep't of Pub. Util. Control v. FERC*, 569 F.3d 477 (D.C. Cir. 2009); *Maine Pub. Utils. Comm'n v. FERC*, 520 F.3d 464 (D.C. Cir. 2008) (per curiam), *rev'd in part sub nom. NRG Power Mktg., LLC v. Maine Pub. Utils. Comm'n*, 558 U.S. 165 (2010).

In the forward capacity market, local utilities contract with generators to buy quantities of energy three years ahead of their energy needs. With three years' notice, demand in the forward capacity market is able to signal that a new entrant is needed while there is still time to develop additional generation capability.

ISO New England sets prices in the forward capacity market by administering a forward capacity auction. First, ISO New England determines the projected amount of capacity ("Installed Capacity Requirement") that the region will require to operate reliably in three years. Next, ISO New England holds a descending price auction, in which generators submit offers to provide quantities of power at certain prices, three years in the future. If the bid capacity at a given price exceeds the Installed Capacity Requirement, ISO New England lowers the auction price. As the auction price decreases, generators offer less capacity to the auction or exit the auction altogether. A "clearing price" is reached at the lowest price that yields enough supply to meet the Installed Capacity Requirement set by ISO New England. All generators that have successfully bid in the auction are paid the clearing price for the capacity

they provide, even if they submitted a bid lower than the eventual clearing price.

The original ISO New England tariff used a "vertical" demand curve, specifying a fixed demand that defined the capacity sought by the auction. The clearing price was reached at the lowest price that met the fixed demand.

In the orders under review, ISO New England implemented a sloped demand curve. The sloped demand curve establishes a downward trending relationship between price and demand. Price is expressed in the chart as a multiple of the net cost of new entry and demand is expressed as a reserve margin. Using the sloped demand curve, if the offered capacity price is decreased, it corresponds to an increased demand. Rather than the New England region procuring enough capacity to meet a fixed demand as under the vertical demand curve, it procures enough capacity to meet the variable demand that is set by the supply prices offered in the auction. The clearing price is reached at the point of intersection of the supply curve and the demand curve.

The system-wide sloped demand curve was implemented beginning with the auction for the ninth capacity year (2018-2019). At the time of this petition for review, ISO New England had completed auctions through the eleventh capacity year (2020-2021).

One of the rules in the ISO New England forward capacity auction is the "minimum offer price rule." The minimum offer price rule mitigates the potential for the improper exercise of market power that can occur if a generation resource submits capacity to the auction at a below-cost price, suppressing the clearing price. *See NEPGA*, 757 F.3d at 288-92. States and some utilities participate in the

market as both buyers and sellers of power, giving them the opportunity to exercise this type of market power. For example, a state-sponsored power generation resource could submit a below-cost price offer to the auction, increasing the supply of lower priced power, and lowering the clearing price. Then, that state, as a net buyer of capacity, benefits by purchasing capacity at the resulting artificially low price. The minimum offer price rule mitigates this type of market power by requiring new resources to submit capacity to the auction above a minimum price floor. The minimum price floor is set at the approximate net cost of entry of a new generation resource.

The present petition for review concerns an exemption to this rule that allows a limited amount of state-sponsored renewable generation sources to submit price offers below the minimum price floor.

## B. Regulatory History and Orders Under Review

When the Commission initially approved the minimum offer price rule in the ISO New England tariff, it rejected proposed exemptions to that rule. *ISO New England, Inc*., 135 FERC ¶ 61,029 (Apr. 13, 2011) ("*Buyer Market Power Order*"), *reh'g denied in part*, 138 FERC ¶ 61,027 (Jan. 19, 2012). In rejecting a categorical exemption to the minimum offer price rule, the Commission reasoned that "uneconomic entry can produce unjust and unreasonable prices by artificially depressing capacity prices." *Buyer Market Power Order* at P 170. The Commission stated that the parties could return and file a complaint to seek an exemption under section 206 of the Federal Power Act. *Id*. at P 171. We upheld this order on review. *NEPGA*, 757 F.3d 283.

In 2012, intervenor New England States Committee on Electricity, Inc. filed a complaint seeking an exemption to the minimum offer price rule for certain state-sponsored renewable resources. The proposed exemption was driven by the states' goals to diversify their energy supply and promote the development of renewable energy generation.

The Commission denied the New England States Committee's complaint. *New England States Comm. on Elec. v. ISO New England Inc.*, 142 FERC ¶ 61,108 (Feb. 12, 2013) ("*New England Complaint Order*"), *reh'g denied*, 151 FERC ¶ 61,056 (Apr. 20, 2015). The Commission explained that the New England States Committee did not provide any evidentiary support that a renewable exemption would have a limited price-suppression impact. *New England Complaint Order* at P 34. Also, the Commission distinguished the New England States Committee's request for an exemption from one that it approved in the mid-Atlantic market under the PJM system operator. *Id.* at P 35. The Commission explained that "because [the ISO New England] capacity market relies on a vertical demand curve while PJM's capacity market relies on a sloped demand curve," a renewable exemption would have a larger price impact in the ISO New England system. *Id*.

On April 1, 2014, ISO New England filed a package of reforms to its tariff under section 205 of the Federal Power Act. *ISO-NE*, Docket No. ER14-1639-000, ISO New England Inc. Tariff Filing (Apr. 1, 2014) ("*ISO-NE Tariff*"). The reforms implemented a new system-wide sloped demand curve to replace the vertical curves and included a plan for developing local sloped demand curves in the future. In the reformed tariff, ISO New England included a limited renewable exemption to the minimum offer price rule.

The reformed tariff allows up to 200 megawatts of qualifying new entrant renewable capacity to be exempt from the minimum offer price rule beginning with the ninth capacity year auction. *ISO-NE Tariff*, pp. 129-30, 143-44. The tariff also included a carry-over rule, allowing any unused portion of the 200 megawatt renewable capacity to carry forward for two additional auctions (three years), up to a total cap of 600 megawatts. *Id.*

The Generators protested the renewable exemption, arguing that it was unjust and unreasonable because it will undermine competitive entry and result in significant price suppression. On May 30, 2014, FERC approved ISO New England's reformed tariff. *ISO-NE*, 147 FERC ¶ 61,173 (May 30, 2014) ("*Initial Order*"). In approving the reformed tariff, FERC rejected the Generators' arguments regarding the renewable exemption. Although FERC recognized that "exemptions in general can lower prices, the exemption proposed here is coupled with a sloped demand curve that will limit the impact of price suppression as compared to the existing vertical demand curve." *Id.* at P 83. FERC also explained that "[t]he renewable resource exemption is also tied to load growth . . . , so entry of renewable resources will, in most cases, only displace the new entry required to meet load growth." *Id.*

On June 30, 2014, the Generators requested a rehearing on FERC's approval of the renewable exemption in the ISO New England tariff. The Commission denied the Generators' request for rehearing on January 30, 2015. *ISO-NE,* 150 FERC ¶ 61,065 (Jan. 30, 2015) ("*Rehearing Order*").

On March 30, 2015, the Generators filed a petition for review in this Court. After FERC sought a voluntary remand to permit additional consideration of certain arguments, this

Court granted the request for remand on December 1, 2015. *NextEra Energy Res., LLC v. FERC*, No. 15-1070 (D.C. Cir. 2015).

On remand, the Commission directed ISO New England to revise its tariff to "provide for the inclusion of zonal sloped demand curves in its [Forward Capacity Market] rules, to be implemented beginning with the eleventh Forward Capacity Auction." *ISO-NE*, 153 FERC ¶ 61,338 at P 1 (Dec. 28, 2015). Then, FERC reaffirmed the renewable exemption over the Generators' objections. *ISO-NE*, 155 FERC ¶ 61,023 (Apr. 8, 2016) ("*Remand Order*"), *reh'g denied*, 158 FERC ¶ 61,138 (Feb. 3, 2017) ("*Remand Rehearing Order*"). The Generators petitioned for review.

Before briefing was complete, ISO New England decided that changing market conditions necessitated phasing out the renewable energy exemption. The Commission accepted ISO New England's revised tariff phasing out the renewable energy exemption. *ISO-NE*, 162 FERC ¶ 61,205 at PP 25, 99 (Mar. 9, 2018). The revised tariff is not the subject of the present petition.

## II.    Analysis

Under the Federal Power Act, FERC is required to ensure that generators provide energy at a "just and reasonable" rate. 16 U.S.C. § 824d(a), (e). We review the Commission's final orders under the Administrative Procedure Act. We will vacate FERC decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Commission's factual findings will be upheld if supported by substantial evidence. 16 U.S.C. § 825*l*(b). "[W]e afford great deference to the Commission in its rate decisions" because "'just and reasonable' is obviously

incapable of precise judicial definition." *Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 532 (2008).

The Generators petition for review of FERC's orders, arguing that the renewable exemption creates an unjust and unreasonable rate and that the Commission was arbitrary and capricious. Additionally, the Generators contend that the Commission should have held a hearing on issues of disputed facts.

**A. Did FERC set a "just and reasonable" rate?**

The Generators' central complaint is that state-subsidized renewable resources entering the forward capacity market with below-cost prices will suppress the clearing price. The Generators argue that any price suppression amounts to a subsidy for renewable resources paid for by third-party suppliers.

First, we consider the Generators' argument that the renewable exemption is contrary to the purpose of the forward capacity market. The forward capacity market uses "competitive bidding for future capacity contracts" to "both incentivize[] and account[] for new entry by more efficient generators, while ensuring a price both adequate to support reliability and fair to consumers." *Connecticut Dep't of Pub. Util. Control*, 569 F.3d at 480. In approving the renewable energy exemption, the Commission "sought to accommodate [state] policy decisions" to develop renewable resources "by allowing a limited portion of renewable resources to submit bids into the capacity market that are exempt from the minimum offer price rule." *Remand Rehearing Order* at P 8. The Commission acknowledged that renewable "resources will be constructed with or without a renewables exemption."

*Remand Order* at P 62. If those resources "are not reflected in the [Forward Capacity Market], then the [Forward Capacity Market] may send an incorrect signal to construct new capacity that is not needed." *Remand Rehearing Order* at PP 9, 48. This would lead the market to procure redundant capacity. *Id.* The Commission determined that the exemption allowed it "to send appropriate price signals regarding where and when new resources are needed." *Id.* at P 9. As a result, the Commission concluded that "[t]he renewables exemption fulfills [its] statutory mandate by protecting consumers from paying for redundant capacity." *Remand Order* at P 33.

The Commission must "protect[] . . . consumers from excessive rates and charges." *Xcel Energy Servs. Inc. v. FERC*, 815 F.3d 947, 952 (D.C. Cir. 2016) (quoting *Municipal Light Bds. of Reading & Wakefield v. FPC*, 450 F.2d 1341, 1348 (D.C. Cir. 1971)). We defer to the Commission's determination that the renewable exemption effectuates the market's primary purpose by sending the correct demand signals to new entrants and by protecting consumers from excessive rates.

"[S]etting a just and reasonable rate necessarily 'involves a balancing of the investor and the consumer interests.'" *Wisconsin Pub. Power Inc. v. FERC*, 493 F.3d 239, 262 (D.C. Cir. 2007) (per curiam) (quoting *Federal Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944)). The Commission recognized that the renewable exemption has the potential to cause price suppression, which is counter to the Generators' interests. Nonetheless, the Commission determined that the renewables exemption "is consistent with the purpose of the" Forward Capacity Market, "namely, ensuring that price signals are sufficient to incent existing resources to stay in the capacity market, and new resources to enter, so that ISO [New England] meets its reliability

requirements at least cost." *Remand Order* at P 35. In this case, the Commission reasonably balanced the potential for limited price suppression against competing interests in concluding that the renewable exemption to the minimum offer price rule is consistent with the purpose of the forward capacity market.

Next, the Generators argue that allowing price suppression contravenes precedent regarding just and reasonable rates. According to the Generators, the Commission's approval of an exemption to the minimum offer price rule conflicts with its earlier decision in the *Buyer Market Power Order* to reject a categorical exemption to the minimum offer price rule. In *NEPGA*, this Court upheld the Commission's rejection of a categorical exemption because the Commission "reasonably acted to balance competing interests" by "mak[ing] the judgment that encouraging renewable energies was less important than allowing such out-of-market entrants to depress capacity prices." *NEPGA*, 757 F.3d at 295. Although we deferred to FERC's decision "to decline a categorical mitigation exemption," *id.*, we never held that the Commission must always weigh encouraging renewable energies as less important than preventing price suppression.

In the orders under review in this case, the Commission has performed an updated balancing of competing interests in the New England market. In the *Buyer Market Power Order* proceeding, the Commission explained that "[w]hether to grant an exemption is based on each case's unique facts" and the "[p]arties have not provided sufficient specificity to allow us to approve an appropriately narrow exemption." *Remand Order* at P 4 (quoting *Buyer Market Power Order* at P 171). In this case, the Commission considered the price suppression associated with the uneconomic entry of a small quantity of renewable resources, rather than the categorical exemption it

had considered previously in the *Buyer Market Power Order*, and weighed it against state policies to promote renewable entry. *Remand Order* at PP 32-36, 39-43, 67-68; *Remand Rehearing Order* at PP 19-29, 67-68. In its evaluation, the Commission explained that the new sloped demand curve mitigates the price suppression. *Id.* The Commission also considered expert testimony stating that any price suppression is limited by the renewable qualifying criteria, the low caps on the maximum amount exempted renewable capacity, and projected load growth and retirements. *Id.* The Commission explained why its view on the renewables exemption evolved and why the specific circumstances of this case led it to conclude that the renewable exemption is just and reasonable. *Id.* Under these circumstances, the Commission's decisions are distinguishable from the *Buyer Market Power Order*, and the decisions are not in conflict.

The Generators also argue that the orders under review are unreasonable because they are inconsistent with the Commission's decision to reject a renewable exemption to the minimum offer price rule in the *New England Complaint Order*. However, the *New England Complaint Order* is also distinguishable from the present orders because the tariff still relied on a vertical demand curve which results in more significant price suppression than a sloped demand curve. *See New England Complaint Order* at PP 15, 34-35; *Remand Rehearing Order* at PP 67-68.

Additionally, the burden of proof is different in the present case than in the *New England Complaint Order*. In the *New England Complaint Order*, the Commission rejected the complaint under section 206 of the Federal Power Act. *Remand Rehearing Order* at P 49. Under section 206, the complainant had to prove the existing rate was unjust and unreasonable without the renewable exemption, and then prove

that the proposed exemption was just and reasonable. *See Maine v. FERC*, 854 F.3d 9, 24-25 (D.C. Cir. 2017). The present orders under review involve a tariff filing under section 205 of the Federal Power Act. Under section 205, FERC has to prove that it is establishing a just and reasonable rate. *See id*. The Commission is not required to show that the previous rate was unjust and unreasonable in order to demonstrate that the revised rate was just and reasonable under section 205. *See id.* The *New England Complaint Order* does not constrain the Commission from considering that changed circumstances now render the renewable exemption just and reasonable.

Next, the Generators ask the Court to consider a Third Circuit decision to affirm the elimination of an exemption to the minimum offer price rule in the mid-Atlantic power market, but that holding also does not counsel a different outcome in this case. *See New Jersey Bd. of Pub. Utils. v. FERC*, 744 F.3d 74, 100 (3d Cir. 2014) ("*New Jersey*"). In *New Jersey*, the Third Circuit considered a Commission order to eliminate a broad exemption to the minimum offer price rule that applied to any state-mandated resources. *Id*. at 95. New Jersey and Maryland planned to submit "thousands of megawatts of new capacity" below the minimum offer price floor under this exemption. *Id*. at 96. The Third Circuit affirmed the Commission's fact-specific determination that there was "mounting evidence of risk" that price suppression would distort the market and send the wrong signals regarding the need for new entrants to the market. *Id*. at 100-01. Notably, in the same decision, the Third Circuit also affirmed a more limited exemption for solar and wind resources. *Id*. at 106-07. The Third Circuit concluded that "FERC is permitted to weigh the danger of price suppression against the counter-danger of over-mitigation, and determine where it wishes to strike the balance." *New Jersey,* 744 F.3d at 109. We agree. Unlike in *New Jersey*, in this case the Commission found that the danger

of price suppression was minor compared to other market considerations.

FERC has, at various times, considered exemptions to the minimum offer price rule in other markets. *See Remand Order* at PP 32-34. In some cases, the Commission accepted an exemption, despite the potential for price suppression. *See, e.g.*, *New York Pub. Serv. Comm'n*, 153 FERC ¶ 61,022 at P 10 (Oct. 9, 2015); *PJM Interconnection*, 135 FERC ¶ 61,022 at P 152 (Apr. 12, 2011). In some cases, the Commission rejected an exemption because of the potential for price suppression and market distortions. *See, e.g.*, *PJM Interconnection*, 135 FERC ¶ 61,022 at P 139; *New England Complaint Order* at PP 32-35; *New York Indep. Sys. Operator, Inc.*, 122 FERC ¶ 61,211 at P 110 (Mar. 7, 2008).

In those cases in which the Commission has considered exemptions to the minimum offer price rule, it considered exemptions using a fact-specific balancing test, factoring in the scope of the exemption, the existence of sloped demand curves, and the overall impact on the market, and only accepted exemptions that were appropriate based on the specific features of the market. The Commission engaged in the same type of analysis in the present case, and its conclusion is not contrary to precedent. This type of balancing requires an expert understanding of the market, which is well within the Commission's realm of expertise. We see no reason to disturb the Commission's balancing just because it came out in favor of the renewable exemption despite the potential for price suppression.

## B. Did FERC engage in reasoned decision-making?

Now that we have established that an exemption to the minimum offer price rule can be just and reasonable under the

Federal Power Act, we will consider the Generators' arguments that FERC was arbitrary and capricious in its evaluation of the renewable exemption.

*First*, the Generators argue that FERC acted unreasonably because it failed to quantify the price suppression resulting from the exemption. We defer to the Commission's reasoning when it relies on substantial evidence to make a predictive judgment in an area in which it has expertise, such as in the power markets. *Wisconsin*, 493 F.3d at 260. The Generators would like the Court to either require a quantitative assessment of price suppression or for FERC to explain "specifically why it could not have done so." *Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C. Cir. 2017). In *Sierra Club*, we required a quantitative assessment of greenhouse gas emissions, because such an assessment was necessary to forecast the environmental impact of the decision under review. *Id.* Price suppression is not a scientific determination, but rather an economic construct. We permit the Commission to base its market predictions on "basic economic theory, given that it explained and applied the relevant economic principles in a reasonable manner." *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 531 (D.C. Cir. 2010) (per curiam); *see also South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 65 (D.C. Cir. 2014) (per curiam).

The Commission considered the contradictory expert testimony that the Generators presented that described and quantified potentially severe price suppression. *See Remand Order* at PP 37-44. The Commission credited competing expert testimony that predicted the price impact was more limited. *Id*. at PP 40-41. The Commission explained that the experts' conclusions differed because they disagreed on the predicted steepness of the supply curve, and it rejected the Generators' experts' assumptions on that topic. *Id*. It is well

within the Commission's expertise to resolve conflicting expert testimony and make a judgment on which best predicts the scope and magnitude of the price suppression. The Commission is not required to rely only on quantitative predictions. Accordingly, we conclude that FERC relied on substantial evidence in determining that the price suppression from the renewable exemption will be minimal.

*Second*, the Generators argue that FERC acted unreasonably by relying on the sloped demand curve to justify its decision. The Generators argue that even though the sloped demand curve mitigates the price suppression compared to a vertical demand curve, it still results in significant price suppression and an unjust rate.

The Generators' objection revolves around the determination of the point where the supply curve intersects the demand curve, which sets the clearing price. When below-cost energy is added to the market, it shifts the supply curve to the right, so that it intersects the demand curve at a lower clearing price. *Remand Rehearing Order* at P 21. The Generators assert that the supply curve is steep where it intersects the demand curve. Because it is steep, small rightward shifts to the supply curve caused by the introduction of a limited amount of below-cost resources result in an intersection with the demand curve at a much lower clearing price. *See id.* at P 22. The Commission agrees that the steepness of the supply curve influences the magnitude of the price suppression. However, the Commission credited the testimony of an expert witness that explained that the supply curves are likely to be flatter than the supply curves offered by the Generators' experts. *Remand Order* at P 41; *Remand Rehearing Order* at P 25.

Likewise, the Generators also argue the Commission acted unreasonably in accepting ISO New England's revised

demand curves and the addition of local sloped demand curves upon remand. Generators argue that the new demand curves are steeper at the point that they intersect the supply curve than the previous demand curves, resulting in greater price suppression. The Commission determined that the steepness in the new demand curves is mitigated because actual supply curves have been flatter than Generators predicted, and, if the performance of the demand curves changes over time, there are proceedings to review new curves that can address any issues. *See Remand Order* at P 44; *Remand Rehearing Order* at P 37. The Generators object to the inclusion of data from the ninth and tenth capacity year in the Commission's reasoning. However, the record was still open at the time the Commission considered the *Remand Order* and the Commission may fairly consider the market's actual performance.[1]

Again, we defer to the Commission's resolution of conflicting expert testimony regarding the relationship between the intersection between the supply and demand

---

[1] It may appear that the Commission selectively relied on evidence of the performance of the supply curves during the ninth and tenth capacity year while it simultaneously refused to consider evidence that the predicted load growth was not materializing. However, as the Commission acknowledged, load growth was lower than anticipated during the ninth and tenth capacity years. *Remand Rehearing Order* at P 72. But, the Commission relied on retirements in addition to load growth to offset the renewables exemption. The Commission considered evidence that the actual retirements in those years offset the small amount of exempted renewable energy that actually cleared the market even absent load growth. *Id.* at P 73. The Commission further acknowledged that ISO New England affirmed it was committed to revisiting the cap in future years if the load growth and retirements failed to offset the entry of exempted renewables into the market. *Id.* at P 74.

curves and the clearing price. The Commission reasonably determined that price suppression would be minimal because sloped demand curves mitigate price suppression.

*Third*, the Generators argue that FERC acted unreasonably by relying on anticipated load growth and retirements to mitigate price suppression. The Commission relied on expert testimony predicting that existing generators would leave the market and the demand for capacity would grow. Therefore, the small amount of renewable resources would fill some of this demand while prices remained stable. *See Remand Order* at P 53; *Remand Rehearing Order* at P 20.

The Generators counter that load growth failed to occur as the Commission anticipated. "[R]easoned decisionmaking does not require complete prescience." *Florida Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010). The Commission relied on the expert predictions that were available at the time of its decision, and we defer to its use of these predictions.

The Generators also argue that the Commission did not rationally tie the magnitude of the exemption to any particular prediction of load growth or retirement. However, FERC explained that the 200 megawatt exemption was based on the best estimate of load growth, which was "estimated at 189 MW annually, plus an adjustment for the reserve margin required to meet the installed capacity requirement." *Initial Order* at P 83; *Rehearing Order* at P 22. The Commission also acknowledged load growth could be more or less than ISO New England anticipated, but ISO New England committed to "revisit[ing] the cap on the . . . exemption in the future, should the entry of [renewable resources] exceed load growth." *Rehearing Order* at P 22. The Commission acted reasonably in tying the 200 megawatt exemption caps to load growth estimates.

With respect to retirements, the Generators argue that the retirement rationale was inappropriately raised on remand, that uneconomic entry will continue after retirements complete, and that its experts found price suppression will occur even with retirements. The Commission noted that ISO New England had previously predicted 6,500 megawatts of retirements by 2020, which is a substantial portion of the 35,000 megawatt market. *Remand Order* at P 53; *Remand Rehearing Order* at P 73. More recently, ISO New England "estimated that by 2020, resources representing about 30 percent of regional capacity have committed to cease operation or are at risk of retirement." *Remand Order* at P 53. The Commission observed that the predicted retirements were far in excess of the 600 megawatt carry-forward cap, and concluded that the exempted renewable energy would only make a small impact in replacing retiring resources. *Id*. Even with retirements, the Commission acknowledged the potential for minor price suppression. *See Remand Rehearing Order* at P 20. But the Commission is not required to protect against all price suppression. The Commission acted reasonably in concluding that retirements would help mitigate any price suppression.

Accordingly, we defer to the Commission's conclusion that the renewable energy exemption had only a limited potential for price suppression because of the implementation of the sloped demand curve, the prediction of a flatter supply curve, and predicted load growth and retirements. Therefore, we deny the Generators' petition for review.

## C. The Generators' request for a hearing

Lastly, the Generators argue that the Commission should have settled issues of disputed fact regarding price

suppression, load growth, and retirements at a hearing. The Commission's decision on whether to hold a hearing is reviewed for abuse of discretion. *Louisiana Pub. Serv. Comm'n v. FERC*, 184 F.3d 892, 895 (D.C. Cir. 1999). "In general, FERC must hold an evidentiary hearing only when a genuine issue of material fact exists, and even then, FERC need not conduct such a hearing if [the disputed issues] may be adequately resolved on the written record." *Minisink Residents for Envtl. Pres. & Safety v. FERC*, 762 F.3d 97, 114 (D.C. Cir. 2014) (quoting *Cajun Elec. Power Coop., Inc. v. FERC*, 28 F.3d 173, 177 (D.C. Cir. 1994) (per curiam)).

In this case, the Commission decided that the material facts could be resolved on the written record. *Remand Rehearing Order* at PP 99-100. The extensive written record contained expert testimony and analysis regarding the market effects of the renewable exemption, the development of the sloped demand curve, and predictions for load growth and retirements. *See id.* Accordingly, the Commission did not abuse its discretion by relying on the written record to resolve disputes of material fact on these issues.

## III. Conclusion

For the reasons set forth above, the Generators' petition for review is denied.